**UNITED STATES Of America, Plaintiff–Appellee,**

v.

**David Woodbury BAKER, Defendant–Appellant.**

**UNITED STATES Of America, Plaintiff–Appellee,**

v.

**Timothy BLACKWELL, Defendant–Appellant.**

**Nos. 91–5313, 91–5361.**

United States Court of Appeals, Fourth Circuit.

Argued April 7, 1992.

Decided Feb. 4, 1993.

---

Steven Alan Bernholz, Bernholz & Herman, Chapel Hill, NC, argued (G. Nicholas Herman, on brief), for defendant-appellant Blackwell.

Cameron Bruce Littlejohn, Jr., Lewis, Babcock & Hawkins, Columbia, SC, argued for defendant-appellant Baker.

Mark C. Moore, Asst. U.S. Atty., Columbia, SC, argued (E. Bart Daniel, U.S. Atty., on brief), for plaintiff-appellee.

Before ERVIN, Chief Judge, LUTTIG, Circuit Judge, and KIDD, Senior United States District Judge for the Northern District of West Virginia, sitting by designation.

## OPINION

ERVIN, Chief Judge:

Timothy Blackwell was convicted of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i)–(ii). David Baker was convicted of attempting to possess with the intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 846. In addition, both Blackwell and Baker were convicted of conspiracy to possess with the intent to distribute cocaine, in violation of 21 U.S.C. § 846 & 18 U.S.C. § 2. Each defendant appeals his two convictions. Blackwell argues that the evidence was legally insufficient to convict him of either the money laundering or the conspiracy charge, and Baker argues that the evidence was insufficient to convict him of the attempt charge. Baker does not challenge his conspiracy conviction by arguing insufficiency of the evidence, but rather he contends that the district court committed reversible error by refusing to give the jury two instructions. It is his position that the court should have charged the jury on the lesser-included offense of conspiracy to possess cocaine. In

addition, because a mere buyer/seller relationship is inadequate to establish Baker's participation in the conspiracy to distribute, he asserts that the court erred by refusing to charge the jury that Baker's distributor must have known that Baker intended to distribute the cocaine, not merely to make personal use of it.

We agree with Blackwell that the evidence of money laundering was insufficient and thus reverse that conviction, but we find that the evidence was sufficient to convict him of the conspiracy charge. We agree with Baker that the evidence is insufficient to support his attempt conviction and that the district court erred in refusing to give instructions on the lesser included offense in his conspiracy case, thus we reverse both of Baker's convictions and remand his conspiracy case for further proceedings.

### I.

Baker's and Blackwell's convictions arose from a three-year investigation of a drug distribution network. The scheme was centered near Rock Hill, South Carolina and Charlotte, North Carolina. The drug ring was led by John Arrendell and Walter Dennis Purser. To date, over 50 individuals have been convicted on a variety of federal drug charges as a result of this investigation.

Baker and Blackwell were indicted along with 15 other individuals in the instant superseding indictment in the District of South Carolina. All but four of their co-defendants pled guilty prior to trial; one, Odas White, pled guilty during trial; and the final defendant, John Hodges, was convicted along with Baker and Blackwell on November 8, 1990. Hodges did not appeal

his conviction. Baker's involvement in the conspiracy predated adoption of the Sentencing Guidelines, and the district court sentenced him to two five-year concurrent terms of imprisonment. The court sentenced Blackwell under the Guidelines to two 144–month terms of imprisonment, to be served concurrently.

### II.

Blackwell challenges the district court's decision, made at the close of evidence, that the evidence was sufficient, as a matter of law, to support a conviction on the charge of money laundering.[1] On appellate review of sufficiency challenges,

> The relevant question is not whether the appellate court is convinced of guilt beyond a reasonable doubt, but rather whether, viewing the evidence in the light most favorable to the government, *any* rational trier of facts could have found the defendant guilty beyond a reasonable doubt. We must consider circumstantial as well as direct evidence, and allow the government the benefit of all reasonable inferences from the facts proven to those sought to be established.

*United States v. Tresvant,* 677 F.2d 1018, 1021 (4th Cir.1982) (citations omitted). The conviction must be overturned if "the evidence here could only lead to a finding of guilt by an unacceptable process of raw speculation rather than by a reasoned process of inferring guilt beyond a reasonable doubt." *United States v. Giunta,* 925 F.2d 758, 766 (4th Cir.1991).

Blackwell was charged with money laundering on the theory that he concealed his illegal drug proceeds by having a friend use Blackwell's cash to purchase a boat for

---

1. The laundering of monetary instruments statute, 18 U.S.C. § 1956, provides criminal penalties for, in pertinent part:

    (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

    (B) knowing that the transaction is designed in whole or in part—

    (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

    (ii) to avoid a transaction reporting requirement under State or Federal law....

Blackwell while keeping title to the boat in a third person's name. The government contends that Blackwell gave his friend, Odas White, $30,000 of Blackwell's money to give to Darrell McKamey, a mid-level drug dealer in the conspiracy who worked at a marina. According to the government, McKamey, in turn, sold a boat to Blackwell, but retained title to the boat in McKamey's own name.

To sustain a conviction for money laundering under 18 U.S.C. § 1956(a)(1)(B)(i), the government needed to prove the following essential elements: (1) that Blackwell conducted a financial transaction affecting interstate commerce (buying the boat) which involved the proceeds of specified unlawful activity (drug sales); (2) that Blackwell did so knowing that the transaction was designed in whole or in part to disguise the nature, the source, the ownership, or the control of the proceeds (by having the boat remain in McKamey's name); and (3) that Blackwell knew that the property involved in the transaction was derived from unlawful activity. *See United States v. Brown,* 944 F.2d 1377, 1387 (7th Cir.1991).

The evidence supporting the money laundering charge comes primarily from four witnesses: McKamey, who cooperated with the police; Terry Norman, a former member of the Hell's Angel motorcycle club and a former drug dealer; Special Agent Ted Warren of the Bureau of Alcohol, Tobacco and Firearms; and Special Agent Anthony Duarte of the Drug Enforcement Administration.

McKamey testified at trial that he sold a boat to White at the Lake Wylie Marina in South Carolina. According to McKamey, White twice came to the marina to look at boats, the second time with another man. McKamey generally described the man as six feet tall with shoulder length blondish/brownish hair, a description generally resembling Blackwell. McKamey also stated that Blackwell, sitting in the courtroom, "looks like him. But I couldn't swear to it." J.A. 216. Further, McKamey testified that "[t]he gentleman left—or walked

away ..." before White proposed to McKamey that White buy a boat for $30,000 cash, keep it in McKamey's name, and "front" McKamey a kilo of cocaine. J.A. 217–18. According to Jeff Hall, the general manager of the marina, the boat that White bought was white with blue trim.

The government then offered into evidence tape recordings and transcripts of two later conversations between McKamey, who was fitted with a body wire, and White. During the first conversation, which occurred on March 23, 1990, McKamey brought up the subject of the boat and stated: "Damn boat—I mean, it's my boat. Everything is mine, you know." J.A. 283. Later, McKamey asked White whether there were any problems with the boat. White responded that he hadn't seen it in a long time and so did not know. McKamey then asked, "Where is he keeping it? He keeps it on the coast, huh?" J.A. 287. Finally, White stated that "[h]e and his wife split up," assumedly talking about the same unidentified "he." *Id.*

The second taped conversation between White and McKamey occurred on April 10, 1990. The relevant portions of this discussion are as follows:

DM [McKamey]: [W]hen they started asking me, you know, about the boat and knowing you. And I just told them that, you know, hell, we're just friends.

OW [White]: That fucking boat they asked about it in North Carolina.

DM: Are they?

OW: Yeah.

DM: The IRS?

OW: They subpoenaed Tiny's[2] girl friend.

.  .  .  .  .

OW: You know where the god damn boat, you know where that situation come from, don't you?

DM: Nah, not really.

OW: Because, see, they got a ...

DM: Not really. They came in there and asked me about it, and they, uh ...

2. Blackwell's nickname is "Tiny."

OW: Well, they got a Hell's Angel in Winston and he rolled. He'd been a ten-year member, and he rolled. And he told them about the boat and every god damn thing, see.

DM: How'd he know about it? Is he Tiny's friend or something?

OW: Yeah. Tiny a Hell's Angel too.

DM: Oh, I didn't know.

. . . . .

OW: Well, they got him in protective custody see, but he told about ... I mean, all he knows is Tiny had a boat and knows he brought it up in Charlotte....

J.A. 355–57.

Norman, the former Hell's Angel, testified that Blackwell came by Norman's house in Winston–Salem in August 1989 with Blackwell's girlfriend, Patricia Richards, driving a truck pulling a "blue and white boat, probably 23, 25 foot long" that

had a cabin under the deck. J.A. 436. Special Agent Warren testified that he saw Blackwell and White together twice, once at the funeral of a Hell's Angel member (a video of the funeral was played to the jury) and the second time at a Hell's Angel motorcycle rally. Special Agent Duarte testified that between January 1989 and September 1990 there were 27 calls placed from White's restaurant to Blackwell's residence, 30 calls from phones registered to Blackwell to White's restaurant, and 134 calls from phones registered to Blackwell to White's beeper.

■ Blackwell presented the testimony of his wife Kathy, who testified that he had a red boat. The government called Special Agent Warren in rebuttal, who testified about an interview he had with Blackwell's girlfriend, Richards. According to Warren, Richards said that she and Blackwell drove a truck that pulled a blue boat to visit Norman in Winston–Salem.[3]

3. Blackwell challenges the admissibility of Richards' statement to Special Agent Warren, claiming that it is hearsay. The court admitted the statement pursuant to Fed.R.Evid. 804(b)(5), which concerns exceptions to the hearsay rule when the declarant is unavailable. Under this rule, where a declarant is unavailable, the statement in question may be admitted if: (1) it has circumstantial guarantees of trustworthiness, (2) it is offered as evidence of a material fact, (3) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts, (4) the general purposes of the rules of evidence and the interests of justice will best be served by admission of the statements, and (5) the proponent makes known to the adverse party sufficiently in advance of trial or hearing to provide fair opportunity to prepare. We decline to disturb the district court's considered findings as to these elements. See J.A. 812–13. Although the court did not make a specific finding as to the first element, there are circumstantial guarantees of reliability, since Norman's testimony corroborates Richards' statement. The district court found that the second element was met because the testimony was clearly offered as evidence of a material fact, namely, Blackwell's possession of a boat. The district court found that the third element was met for two reasons. First, it found that the "reasonable efforts" that could be expended by the government to procure evidence on the issue were necessarily extremely limited because, in the court's words, "until Mr. Blackwell's wife testified yesterday [that Blackwell owned a red boat, the government] had no real

basis for wanting to offer the testimony of the proposed witness in reply." J.A. 812. Second, the court heard the government's statement that it believed that the Hell's Angels hid Richards to prevent her from testifying. According to the government, as soon as it stated in response to Kathy's testimony that it was going to call two witnesses from North Carolina, two "burly gentlemen" left the trial, and the government's subsequent attempts to find Richards in her usual haunts were unavailing. J.A. 787. We agree with the court's finding that the government took reasonable steps, including issuing a subpoena for Richards and searching for her, to obtain her personal testimony, which would have been the only evidence on the point more probative than Warren's testimony. We agree with the court's finding that the fourth element was met that the general purposes of the rules of evidence and the interests of justice would best be served by admission of the statement. Finally, it is true that the government did not give notice of Warren's testimony until the morning before Warren testified, but, as the court found, this delay is explained by its last-minute need for the testimony and its understandable lack of success in locating Richards. We agree with the district court that pretrial notice was wholly impracticable and thus, under the exceptional circumstances of this case, we uphold its grant of notice flexibility. See United States v. Iaconetti, 540 F.2d 574, 578 & n. 6 (2d Cir.1976), cert. denied, 429 U.S. 1041, 97 S.Ct. 739, 50 L.Ed.2d 752 (1977). Cf. United States v. Heyward, 729 F.2d 297, 299–300 & n. 1 (4th Cir.1984) (Rule 804(b)(5) is to be used sparingly and only in exceptional circum-

We do not lightly overturn a jury verdict. In this case, however, we are persuaded that the evidence, viewed with all inferences in the government's favor, does not suffice to uphold Blackwell's conviction for money laundering.

None of the evidence ever firmly identified the boat in question after it was bought, and without precisely identifying one of the elements of the crime, i.e., the property that supposedly was used to launder the drug money, the government cannot sustain the conviction. *See Brown*, 944 F.2d at 1387. Norman's testimony that Blackwell had a blue and white boat and Warren's recital of Richard's statement that Blackwell had a blue boat doesn't necessarily identify the boat in question, which was white with blue trim. There are innumerable boats matching the general, and inconsistent, descriptions offered at trial.

Further, none of the evidence showed that Blackwell ever possessed the boat that White purchased. The government never established that the man who accompanied White to the marina was Blackwell. McKamey flatly stated that "I can't hardly say that I identify him." J.A. 217. Even if a reasonable jury could find that this man was Blackwell, the government failed to show that he was in any way involved in the transaction since McKamey testified that the man left before White and McKamey discussed the purchase of the boat. In addition, the agents' testimony that White and Blackwell were seen together at two large gatherings and that the two evidently called each other repeatedly proves no relationship between Blackwell and the boat, or any boat at all. As the government conceded at oral argument, it is forced to rely upon the two tapes of McKamey's conversations with White to establish the relationship between the boat that White purchased and Blackwell, but we find these tapes too inconclusive to bear the weight that the government places on them. In these tapes, neither McKamey nor White stated who the "he" was who was keeping the boat.

Even if the evidence could be interpreted as showing that Blackwell possessed the boat for a time, it never showed that he was the real owner. The tapes never said that the "he" who was referred to was the true owner of the boat. In fact, McKamey said that the boat was his.

Also, none of the evidence ever identified the money that White paid McKamey for a boat was Blackwell's money. Again, that there was evidently a relationship between White and Blackwell does not show that the money that White used was really Blackwell's. Finally, none of the evidence identified the source of the money; the government never proved that it was proceeds from drug sales.

The government, in response to questions about the adequacy of its evidence at oral argument, repeatedly pointed us back to the McKamey tapes. It is true that Blackwell and his wife had split up, the government had spoken with Blackwell's wife about a boat, that a Hell's Angel (Norman) had "rolled" and had also told the authorities about a boat, and that Norman and Blackwell knew each other. While these facts are *consistent* with the government's theory of the case, they are also consistent with various other possibilities, and to conclude that they would permit a reasonable jury to establish Blackwell's guilt of money laundering beyond a reasonable doubt is to condone conviction through raw speculation. *See United States v. Giunta*, 925 F.2d 758, 766 (4th Cir.1991). In the absence of specific evidence identifying the boat that White paid for after it was bought, identifying Blackwell as the possessor or owner of this boat, showing that the money White used was really Blackwell's, and showing that this money was the product of drug transactions, these reeds are simply too slender, in our judgment, to sustain Blackwell's conviction for money laundering.

### III.

■ Blackwell also challenges the sufficiency of the evidence used to convict him

stances; notice requirements are to be construed strictly), *cert. denied,* 469 U.S. 1105, 105

S.Ct. 776, 83 L.Ed.2d 772 (1985).

of conspiracy to possess with the intent to distribute cocaine. The government must first show that a conspiracy to commit the crime existed. A conspiracy is an agreement between two or more individuals to commit a criminal act. *Morrison v. California*, 291 U.S. 82, 92, 54 S.Ct. 281, 286, 78 L.Ed. 664 (1934). This agreement may be inferred from the facts and circumstances of the case. The government must also show the alleged conspirator's knowledge of the conspiracy's purpose and some voluntary and intentional action indicating his participation. These elements, knowledge and participation, may also be proven by circumstantial evidence. *United States v. Laughman*, 618 F.2d 1067, 1074–75 (4th Cir.), *cert. denied*, 447 U.S. 925, 100 S.Ct. 3018, 65 L.Ed.2d 1117 (1980); *see also United States v. Manbeck*, 744 F.2d 360 (4th Cir.1984), *cert. denied*, 469 U.S. 1217, 105 S.Ct. 1197, 84 L.Ed.2d 342 (1985).

█ That a conspiracy to distribute cocaine in the Rock Hill and Charlotte areas by the Purser–Arrendell organization existed is undisputed, as is White's and McKamey's participation in this conspiracy. To prove action indicating Blackwell's participation, the government incorporates the evidence discussed above in connection with money laundering and one additional piece of evidence, Norman's testimony that he engaged in a cocaine transaction with Blackwell in Winston–Salem in 1988. Norman testified that Blackwell promised Norman a kilo of cocaine and gave Norman a half kilo, promising that "[Blackwell's] partner would get the rest to [Norman]." J.A. 435. Some time later, White brought Norman the other half kilo. Norman testified that he paid Blackwell $13,000 in cash and $8,000 worth of methamphetamine for the entire kilo when Blackwell visited Norman with Richards.

Accepting Norman's testimony as true, as we must in reviewing the jury's guilty verdict, Blackwell and White were partners who distributed cocaine together. The law is well settled in this circuit that the uncorroborated testimony of an accomplice may be sufficient to sustain a conviction. *Manbeck*, 744 F.2d at 392. We note, however, that even were corroboration required, the large number of phone calls logged between phone numbers controlled by White and Blackwell supports the view that the two were partners. We accordingly affirm Blackwell's conviction of conspiracy to possess with the intent to distribute cocaine.

█ Blackwell points us to a further problem, namely, that the cocaine transaction in Winston–Salem to which Norman testified may be irrelevant to the Rock Hill/Charlotte conspiracy with which Blackwell was charged in the indictment. However, the court correctly charged the jury on the possibility that there were multiple conspiracies. *See* J.A. 889–90. Instead of finding that there were two conspiracies, the jury apparently determined that Blackwell's drug activities were part of the larger, single conspiracy in Rock Hill and Charlotte. The finding of a single conspiracy by the jury must stand unless the evidence, taken in the light most favorable to the government, would not allow a reasonable jury to so find. *See United States v. Leavis*, 853 F.2d 215, 218 (4th Cir.1988); *United States v. Urbanik*, 801 F.2d 692, 695 (4th Cir.1986). The evidence does allow the jury to have drawn the inference that White's participation as Blackwell's "partner" meant that Blackwell was a part of the charged conspiracy, and that his conspiracy conviction should be sustained.

### IV.

Baker challenges the sufficiency of the evidence used to convict him of attempting to possess with the intent to distribute cocaine. The government's evidence against Baker consisted primarily of testimony from three witnesses: Roy Langley, a primary South Carolina cocaine distributor for the Purser–Arrendell organization in 1986 and 1987; Dwayne Langley, Roy's brother; and Ruth Shore, a former hair dresser and low-level drug distributor.

Roy testified that he first became involved in cocaine distribution in approximately 1979 by smuggling seven to eight ounces from Bogota, Colombia to the United States. Roy testified that he sold one

ounce of this cocaine to Baker, and that Baker later said that he gave a portion of this ounce to "Kit." In 1986 and 1987, Roy sold cocaine for Walter Dennis Purser and Stan Barfield, the principal South Carolina Purser–Arrendell distributors. Roy testified that one of his main customers was Baker, who purchased ounce quantities. Roy stated that both he and Baker were addicted to cocaine and used it together frequently, in quantities of up to an ounce each per day.

Roy testified that in the spring of 1987, Baker introduced Roy to Ruth Shore, describing her as Baker's customer, and asked Roy to supply Shore with cocaine in Baker's absence. Shore testified that Baker sold her one ounce of cocaine two times, and that he often came to her house to smoke cocaine. Roy testified that around May 1987, Baker attempted to purchase some cocaine from Roy to take to "Kit" in Charlotte. Further, Roy's testimony states that, shortly before Roy's arrest in June 1987, Roy stopped selling cocaine to Baker because Baker was getting "squirrely," often coming over or calling at odd hours, presumably to purchase cocaine. J.A. 639. In addition, Roy testified that Baker's brothers and wife tried to keep Baker away from Roy's house, apparently to stop his drug consumption.

Because Baker's cocaine habit had gotten out of control, his wife had him committed to Charter Rivers Hospital in West Columbia, South Carolina on June 18, 1987. Later that day, Baker escaped from the hospital and called Roy to pick him up. Roy and his brother Dwayne did so and brought Baker to Rock Hill. Roy testified that Baker said that he needed to hide from his wife and the police, who were trying to put him back in the mental institution, and that he needed to get money so he could flee the country. Roy rented a motel room for the night in Fort Mill, South Carolina and provided over an ounce of cocaine that the three men consumed that night.

The next day's events (June 18 1987) provide the basis for Baker's indictment and conviction of attempt to possess with the intent to distribute cocaine. Roy testi-

fied that Baker called Rock Hill National Bank (the "Bank") to get money because Baker "knew somebody there in Rock Hill National that would give him his money without a bunch of explanations." J.A. 642. Peggy Mathews, a Bank employee who worked at the Eastside branch office, testified that Baker called her that day in an effort to cash a $100 counter check (she instead called her Branch Administrator, who called the Sheriff). Roy testified that Baker was trying to obtain the money to pay for cocaine; however, according to Roy, Baker did not say how much cocaine he intended to pay for with this money. Roy did not say whether the money was to pay for the cocaine Baker consumed the previous night, nor, if it were for additional cocaine, whether it was for personal use or for distribution. On cross-examination, Roy testified that Baker tried to obtain the money so that he could leave the area because of the problems with his wife. Dwayne testified that Baker wanted the money to give to Roy for cocaine Baker had consumed the previous night.

Apparently because Baker's attempt to cash a check at the Bank's Eastside branch proved unsuccessful, the three men drove to the Carowinds Boulevard branch in two cars, Roy in his Mercedes and Baker and Dwayne in Roy's Chevette. Roy pulled into a parking lot close to the Bank and was approached by police officers who asked Roy if he knew Baker. The officers saw a gun in Roy's Mercedes, and with Roy's consent the officers searched the trunk, where they found a kilogram of cocaine. Roy was arrested and later convicted of cocaine trafficking. At approximately the same time, Baker and Dwayne, who were circling around the Bank parking lot, saw a police car. In fear of being found by the police, Baker jumped out of the car and ran across a field, where he was picked up by Dwayne. Dwayne testified that Baker said he would pay Dwayne to hide him until he could end his cocaine addiction, because he didn't want to return to the hospital. After six days, Baker apparently contacted his family and returned to the hospital.

In order to convict Baker of attempting to possess the cocaine found in Roy's trunk for the purpose of distributing it, the jury had to find (1) that Baker had culpable intent; and (2) that Baker's conduct constituted a substantial step towards the commission of the substantive offense, i.e., possession with the intent to distribute cocaine, that is strongly corroborative of that intent. *United States v. Pelton*, 835 F.2d 1067, 1074 (4th Cir.1987), *cert. denied*, 486 U.S. 1010, 108 S.Ct. 1741, 100 L.Ed.2d 204 (1988). For Baker to have had culpable intent, he "'must have been acting with the kind of culpability otherwise required for the commission of the crime he is charged with attempting.'" *United States v. McFadden*, 739 F.2d 149, 152 (4th Cir.), *cert. denied*, 469 U.S. 920, 105 S.Ct. 302, 83 L.Ed.2d 236 (1984) (quoting *United States v. Stallworth*, 543 F.2d 1038, 1040 (2d Cir. 1976)). Therefore, in determining whether Baker had culpable intent—in other words, that he sought to possess cocaine with the intent to distribute it—we must decide (1) whether there is sufficient evidence in the record, taking all inferences in favor of the government, that Baker intended to use the money from the Bank to purchase cocaine at all, rather than to flee, and (2) whether, assuming Baker intended to use the money to purchase cocaine, he intended to distribute the cocaine purchased rather than to use it himself. *See United States v. Mandujano*, 499 F.2d 370, 376, 379 (5th Cir. 1974), *cert. denied*, 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975).

■ Considering the first issue, we believe that sufficient evidence in the record exists, although just barely, that Baker intended to purchase cocaine with the money he was trying to obtain. Roy, the person from whom Baker was supposed to be buying cocaine and who testified on behalf of the government, offered contradictory testimony on this issue: He stated at one point that Baker intended to use the money to flee, at another point that Baker intended to use the money to buy some unspecified amount of cocaine, and at yet a third point that Baker intended to use the money to flee. Dwayne stated that Baker intended to use the money to pay for the cocaine from Roy that Baker had consumed the previous night. Viewing the evidence in the light most favorable to the government, a reasonable jury could believe Roy's statement that Baker intended to use the money to buy some unspecified cocaine and disbelieve his other statements regarding Baker's intentions to flee, and either in addition or alternatively, a jury could believe Dwayne's statement that Baker intended to use the money to pay for the previous night's cocaine. Either way, the requirement that Baker intended to use the money to buy cocaine would be met.

■ However, the government fails to meet its burden on the second issue to establish that Baker intended to use the money from the Bank to purchase cocaine for distribution. No testimony in the record suggests that Baker intended to buy cocaine for the purpose of distribution on June 19, 1987, nor does any testimony in the record establish that Baker sought to purchase a particular or even approximate quantity of cocaine from which the jury could infer that the purpose was distribution. Roy did not testify that Baker intended the cocaine for distribution instead of for personal consumption; he stated that he had no idea of the amount Baker intended to purchase or of the use he intended for the cocaine. Dwayne testified that Baker intended to use the money to pay for the cocaine Baker had consumed the previous night, a plan plainly inconsistent with distribution.

In addition, the fact that Baker asked Mathews to cash only a $100 counter check undercuts the inference that Baker intended the money to purchase cocaine for distribution. Cocaine, the record demonstrates over and over again, is an expensive drug. The kilo of cocaine Roy had in his trunk was worth approximately $70,000; the cocaine the three men consumed the previous night was worth approximately $2,000.[4]

---

**4.** Shore testified and the government confirmed that she sold one ounce of cocaine to an undercover agent in 1987 for approximately $2,000. J.A. 544. We use this price as a rough approxi-

The overwhelming costs involved with its purchase suggest that Baker likely sought such a small amount of money only to flee. Even accepting that he wanted the money to purchase cocaine, however, the extravagant costs involved make it difficult to draw any other conclusion but that Baker intended to use the cocaine for personal consumption, either to pay for drugs previously used or to buy a small additional amount. Substantial uncontradicted evidence in the record points to the conclusion that Baker would have intended to consume any cocaine that he bought. The record makes it clear that Baker was undeniably a cocaine addict with a severe problem; he had just broken out of a hospital to which he had been committed by his wife for addiction; and he had consumed a large amount of cocaine just the previous night. The rest of the evidence the government presented about Baker's alleged limited past cocaine dealings is insufficient, drawing all inferences in the government's favor, to show that, on this particular occasion, Baker intended to purchase cocaine for distribution. In fact, the only witness who testified to buying cocaine from Baker, Ruth Shore, was, by her own and Roy's accounts, purchasing cocaine from Roy and not Baker at the time that these events occurred.[5]

While the government has shown Baker's culpable intent *to possess* cocaine on June 19, 1987, this showing is insufficient for the government to carry its burden. Because the government has failed to show culpable intent by Baker to possess cocaine *with the intent to distribute it* on this particular day, the jury's guilty verdict for the attempt to distribute charge must be reversed and this charge dismissed.[6]

mation for the street value of cocaine. There are 35 ounces in a kilo, and 35 multiplied times $2,000 equals $70,000.

5. The fact that Baker ran away once he saw a police car does not demonstrate his intent to distribute cocaine. Baker was unquestionably fleeing the police since, as evidenced by their questions addressed to Roy in the parking lot, they were attempting to recommit Baker to the hospital.

## V.

Baker next appeals his conspiracy conviction by challenging the district court's refusal to give two jury instructions. First, Baker requested that the district court charge the jury on the lesser-included offense of conspiracy to possess cocaine. Second, Baker argued that, since a mere buyer/seller relationship is inadequate to establish his participation in the conspiracy to distribute, the court should charge the jury that Baker's distributor must have known that Baker intended to distribute the cocaine, not merely to use it personally.

### A.

The court refused Baker's request to give the lesser-included conspiracy to possess cocaine charge because "simple possession is not charged." J.A. 914. That reasoning constitutes error. According to the Supreme Court, "it is now beyond dispute that the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." *Keeble v. United States*, 412 U.S. 205, 208, 93 S.Ct. 1993, 1996, 36 L.Ed.2d 844 (1973). Whether the individual was charged in the indictment with the lesser-included offense is irrelevant. *See* Fed.R.Crim.P. 31(c).[7] The Court's rationale for requiring the lesser-included instruction is that "[w]here one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of *some* offense, the jury is likely to resolve its doubts in favor of conviction." *Id.* at 212–13, 93 S.Ct. at 1998. For the defendant to be entitled to a lesser-included offense, the proof on the element that differentiates the two offenses must be sufficiently in dispute to allow a jury

6. Because we find no culpable intent, we do not need to consider whether Baker's actions constituted a substantial step in carrying out this intent.

7. According to Rule 31(c), Conviction of Less Offense, "The defendant may be found guilty of an offense necessarily included in the offense charged...."

consistently to find the defendant innocent of the greater and guilty of the lesser offense. *See United States v. Blankenship*, 548 F.2d 1118, 1120 (4th Cir.1976). We are in accord with the Seventh Circuit on the evidentiary requirements for demonstrating a dispute:

> Although this requirement usually is satisfied by the presentation of sharply conflicting testimony on the element distinguishing the greater offense from the lesser offense, [citation omitted] it also may be satisfied where there is no conflict in the testimony but the conclusion as to the lesser offense fairly may be inferred from the evidence presented, "including a reconstruction of events gained by accepting the testimony of one or more witnesses only in part."

*United States v. Medina*, 755 F.2d 1269, 1273 (7th Cir.1985) (quoting *United States v. Sinclair*, 444 F.2d 888, 890 (D.C.Cir. 1971)).

■ The district court has no discretion to refuse to give a lesser-included instruction if the evidence warrants the instruction and the defendant requests it. *See Guam v. Fejeran*, 687 F.2d 302, 305 (9th Cir.1982) (per curiam), *cert. denied*, 460 U.S. 1045, 103 S.Ct. 1444, 75 L.Ed.2d 800 (1983); *see also United States v. Gibbs*, 904 F.2d 52, 58 (D.C.Cir.1990) (" 'A defendant is entitled to an instruction on a lesser included offense if there is any evidence fairly tending to bear upon the lesser included offense, "however weak" that evidence may be.' " (quotations omitted)). In addition, in prosecutions for conspiracy to possess with the intent to distribute illegal drugs, conspiracy to possess is a necessarily included offense. *See United States v. O'Meara*, 895 F.2d 1216, 1219–20 (8th Cir.), *cert. denied*, 498 U.S. 943, 111 S.Ct. 352, 112 L.Ed.2d 316 (1990).

We have previously held that a lesser-included possession instruction in drug distribution cases such as this one is required if requested unless, as a matter of law, the evidence would "rule out the possibility of a finding of simple possession, [because the quantity of drugs found was] so huge as to require that the case proceed on the theory that the quantity conclusively has demonstrated an intent to distribute." *United States v. Levy*, 703 F.2d 791, 793 n. 7 (4th Cir.1983). In *Levy*, we held that the district court committed reversible error by refusing to charge the jury on the lesser-included offense of simple possession of 4.75 ounces of 95% pure cocaine in addition to the greater offense of possession with intent to distribute. *Id.* at 792–93. We reasoned that:

> [T]here was a substantial basis for an inference that the defendant might have possessed the cocaine only for his own consumption and not preliminary to sale or other distribution.... [Because the] question of whether the defendant had the purpose to distribute was capable of two answers, ... the lesser included offense instruction was appropriate.

*Id.* The District of Columbia Circuit in *United States v. Gibbs*, 904 F.2d 52 (D.C.Cir.1990), also overturned a possession with intent to distribute cocaine conviction when the district court failed to charge the jury on the lesser-included offense of simple possession. That circuit's test mirrors ours:

> We have no doubt that the evidence was *sufficient* to convict the appellants of possession with intent to distribute; but, when the issue is the propriety of a lesser-included offense instruction, the test is whether a reasonable jury could nonetheless find the appellants guilty only of simple possession.

*Id.* at 59 (citing *United States v. Burns*, 624 F.2d 95, 104 (10th Cir.), *cert. denied*, 449 U.S. 954, 101 S.Ct. 361, 66 L.Ed.2d 219 (1980)).

■ In this case, the evidence, as a matter of law, does not "rule out a possible inference of" conspiracy to possess. *Levy*, 703 F.2d at 794 n. 7. It is clear that Baker was an addict. Roy testified that Baker's family kept trying to keep Baker away from Roy, presumably to stop him from consuming cocaine, and Baker's wife eventually had to commit him to the hospital because of his addiction. Baker's defense at trial was that he was an abuser, not a distributor, of cocaine. *See* Tr. 64–67

(opening statement of Baker's counsel); Tr. 1517–1531 (closing statement). According to Roy, Baker bought one to three ounces of cocaine a week, which is a large amount but which could be consistent with personal consumption. According to Roy and the evidence adduced at trial, Baker was well off financially,[8] and nowhere did the government show that he paid for his drugs with proceeds from drug sales.

In addition, the evidence that Baker had participated in the conspiracy as a distributor was sufficiently in dispute to warrant the instruction. The jury rationally could believe the testimony of the government's witnesses about Baker's purchase of large amounts of cocaine, since his heavy addiction was undisputed, but choose not to believe the witnesses concerning Baker's alleged distributions of cocaine, isolated as they were. At trial, Baker argued vigorously that the jury should not credit testimony about the distributions, because, among other things, each witness who testified to this effect received favorable immunity agreements and thus could not be fully trusted. See id. (opening and closing statements). The jury indeed was not required to believe Shore's and Roy's testimony that Baker twice sold her an ounce of cocaine, since the government agreed in Shore's case not to deport her to Germany, and in Roy's case, it agreed to furnish him with a lawyer to contest his state guilty plea and not to prosecute him at all for the conspiracy to possess with the intent to distribute drugs. Similarly, the jury was not required to believe Roy's hearsay testimony about "Kit." We conclude that the evidence would allow a jury to find that Baker was guilty merely of conspiracy *to possess* cocaine. Therefore, it follows that the district court erred in refusing to instruct, at Baker's request, the jury on this lesser-included offense.[9]

The jury necessarily found every fact required for convicting Baker of the lesser-included offense of conspiracy to possess cocaine when it found him guilty of the greater-included offense of conspiracy to possess with the intent to distribute cocaine. We find that there is sufficient evidence in the record to support Baker's conviction of the greater offense, and, as a result, there is also sufficient evidence to support his conviction of the lesser offense. Therefore, we hold that the district court may, after hearing from all parties and obtaining the government's consent, set aside Baker's conspiracy to distribute conviction and enter a judgment of conviction for the included offense of conspiracy to possess instead. Alternatively, it is within the district court's discretion to order a new trial. *See Levy*, 703 F.2d at 794 n. 9 (raising possibility of utilizing procedure but finding it inappropriate in that case based on government's misconduct) (citing *United States v. Burns*, 624 F.2d 95, 105 (10th Cir.), *cert. denied*, 449 U.S. 954, 101 S.Ct. 361, 66 L.Ed.2d 219 (1980)).

### B.

Since the issues relating to Baker's other challenges to the district court's jury instructions are not likely to recur, we decline to address them at this time.

### VI.

For the aforementioned reasons, we reverse Blackwell's money laundering conviction but uphold his conspiracy to possess

---

8. Baker had substantial family money, and he worked for his father, who owned Paddock Pools. Baker's father testified to the large amounts of money Baker had access to: Baker was employed in various positions at Paddock Pools from 1983 until 1990; Baker received a work bonus in December 1986; Baker's father gave Baker a $20,000 loan in June 1987; and Baker had access to and made significant cash disbursements from his $162,000 trust fund. *See* Tr. 1361–66, 1389. According to Roy, Baker had a "fairly nice house, out on the river," J.A. 631, and owned a Blazer and a Bitter sports car.

9. We do not dispute that sufficient evidence exists in the record to support the judge's instructing the jury on the issue that Baker conspired to possess with the intent to distribute cocaine. The record contains sufficient evidence to permit a jury rationally to find Baker guilty of such an offense. That is not the question facing us here, however. Rather, the question is whether, having given the instruction for the greater-included offense, the court was also required to give the instruction for the lesser-included offense.

with the intent to distribute cocaine conviction. Since the district court imposed both of these sentences concurrently, our disposition does not disturb Blackwell's term of imprisonment. We also reverse both of Baker's convictions and remand his case to the district court for further proceedings not inconsistent with this opinion.

No. 91–5313—REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.

No. 91–5361—AFFIRMED IN PART AND REVERSED IN PART.

LUTTIG, Circuit Judge, concurring in the judgment in part and dissenting in part:

I concur only in the judgments reached by the court in Parts III and V of its opinion. In Parts II and IV of its opinion, respectively, the court reverses for insufficiency of the evidence appellant Blackwell's conviction for money laundering and appellant Baker's conviction for attempting to possess with intent to distribute cocaine. I dissent from these parts of the opinion because there was substantial evidence to support both convictions.

## I.

The government introduced substantial evidence in support of Blackwell's money laundering conviction. The government's theory was that Blackwell enlisted Odas White, a friend and partner of Blackwell's in the drug trade, to purchase a boat from Darrell McKamey with Blackwell's drug transaction proceeds and to have McKamey retain title so as to disguise the true nature of the transaction.

It is undisputed that the government introduced evidence at trial that White did purchase a white boat with blue trim from McKamey with $30,000 in cash and did "front" McKamey one kilogram of cocaine, and that McKamey retained title to the boat. The majority holds, however, that this and the balance of the evidence introduced by the government was inadequate to support Blackwell's conviction because, it concludes, there was insufficient evidence from which a juror could infer that Blackwell was responsible for White's purchase of the boat from McKamey.

The underlying error of the majority, and the error that causes it to adjudge the government's evidence on each of the above grounds insufficient, is that it refuses to permit the jury to make any inferences at all from the taped conversations between White and McKamey, because, it says, "neither McKamey nor White stated who the 'he' was who was keeping the boat." *Ante* at 1254. Says the court, as a result of this "indefinite reference," the tapes are "too inconclusive." This is a remarkable holding. White and McKamey repeatedly referred to "Tiny," which is Blackwell's nickname. They noted that "Tiny" was a Hell's Angel, which Blackwell was. They referred to the fact that "he" and his wife had "split up," which Blackwell and his wife had. J.A. at 287, 969. They alluded to the fact that "Tiny's girl friend" had been questioned by authorities, which Patricia Richards, Blackwell's girlfriend, had. *Id.* at 815–18. And they discussed the fact that a friend of "his" in the Hell's Angels had "rolled" and informed authorities of "his" boat purchase, which Blackwell's friend, Terry Norman, a former Hell's Angel, had recently done with respect to Blackwell. Not only is there no legitimate basis for denying jurors the inference that White and McKamey were referring to Blackwell in these conversations; as a matter of common sense, it seems inconceivable that they were referring to anyone other than Blackwell.

When the evidence from the transcripts of the conversations between White and McKamey is properly considered, it is apparent that for each fact as to which the majority asserts that the evidence was insufficient, there is substantial, and in most instances overwhelming, record support.

The majority concludes, for example, that there was no evidence from which a juror could reasonably infer that the white and blue trim boat purchased by White was Blackwell's boat or possessed by him. *Ante* at 1254. There was, however, an abundance of evidence to support either inference. White acquiesced in, if not con-

firmed, a statement by McKamey during their conversation of March 23, 1990, that Blackwell was keeping on the coast the boat that White bought from McKamey. J.A. at 287. And in the April 10, 1990, conversation between White and McKamey, White told McKamey that the Hell's Angel who "rolled" on Blackwell knew that Blackwell had a boat that he had bought in Charlotte, the location of White's purchase, and that law enforcement officials were interested in this boat. *Id.* at 355–57. Additionally, Terry Norman, the former Hell's Angel and friend of Blackwell's, informed law enforcement officials that Blackwell and his girlfriend Patricia Richards were towing a blue and white boat when they visited him in Winston–Salem in 1989, *id.* at 436–47; likewise, Special Agent Warren testified that Richards had stated to him in an interview that she and Blackwell were towing a blue boat when they visited Norman in Winston–Salem. *Id.* at 816–18.

The majority concludes on a related score that "[t]he government never established that the man who accompanied White to the marina was Blackwell" and that "[e]ven if a reasonable jury could find that this man was Blackwell, the government failed to show that he was in any way involved in the transaction." *Ante* at 1254. There was, however, a host of evidence from which the jury could have inferred both that Blackwell was the man accompanying White when he met with McKamey and that Blackwell was "involved in the transaction." The transcriptions of the tapes of the conversations between White and McKamey establish to a virtual certainty that Blackwell was involved in the transaction. They certainly are sufficient to permit the inference that he was behind the transaction. The government was not even required to prove that Blackwell accompanied White on the visit when he purchased the boat. But there was sufficient evidence from which the jury could make this inference. McKamey, for example, testified in court that Blackwell fit the description of the man who had accompanied White on the day when White purchased the boat. J.A. at 214–18. In concluding that there was insubstantial evidence that

Blackwell was "involved in the transaction," *see ante* at 1254, the majority seizes upon McKamey's testimony, J.A. at 217, that the man accompanying White "walked away" before White actually proposed to McKamey that he purchase the boat. The mere fact that Blackwell "walked away" at the moment of the transaction in no way undermines the possibility of the inference that he was involved in the transaction. If anything, particularly given the nature of the crime, the fact that he walked away just before consummation of the sale tends to reinforce the permissibility of the inference that he was involved and merely wished to disguise his role in the transaction.

The majority next concludes that the evidence "never showed that [Blackwell] was the real owner" of the boat and that "[i]n fact, McKamey said that the boat was his." *Ante* at 1254. Again, the transcribed tapes of the conversations between White and McKamey all but conclusively establish that the boat purchased by White belonged to Blackwell. The fact that title remained in McKamey's name, of course, is entirely consistent with, in fact an integral part of, the money laundering offense of which Blackwell was convicted.

Finally, the majority determines that the government never proved that the $30,000 used by White to purchase the boat was Blackwell's or that it represented drug proceeds. *Id.* The jury obviously could reasonably infer that the purchase money was Blackwell's from the substantial evidence that he was present when the boat was purchased; that he was repeatedly seen in the possession of the boat after the purchase; and that he attempted to disguise his ownership of the boat by having White purchase it and by arranging that McKamey retain title. Likewise, the jury could permissibly infer that the funds used to purchase the boat represented drug proceeds from the considerable evidence that Blackwell was a drug dealer and that, for no other apparent reason, he attempted to hide his ownership of the boat from authorities.

Because the government introduced substantial evidence that Blackwell had laundered money in violation of 18 U.S.C. § 1956, I would affirm Blackwell's conviction. Indeed, in my view, the court's reversal of this conviction represents a disturbing example of an unabashed substitution of an appellate court's view of the evidence for that of the jury.

## II.

The evidence proffered by the government as to Baker's attempt to possess with the intent to distribute cocaine also was more than sufficient to support the jury's verdict.

There was testimony at trial that Baker had distributed cocaine in the past. *See, e.g.,* J.A. at 534–36. Although not without discrepancy, both Roy and Dwayne Langley testified that Baker intended to withdraw money from the bank on June 19, 1987, for the purpose of purchasing cocaine from Roy. *See id.* at 642–43, 736–37. Roy also testified that Baker had sufficient assets that he could have afforded to buy "any amount" of cocaine that day. *Id.* at 643. Because Baker was at the bank when Roy was arrested while in the possession of one kilogram of cocaine, *id.* at 644–46, and because there was testimony that Baker had the financial wherewithal to purchase this amount of cocaine, a jury could reasonably infer that Baker intended to purchase that amount. Of course, a jury can permissibly infer an intention to distribute from the attempted possession of a kilogram of cocaine.

That Baker attempted to cash a counter check at one bank for only $100 does not, contrary to the majority's view, *see ante* at 1257, defeat the permissibility of this inference, because the government also introduced evidence that Baker subsequently went to a second bank to withdraw money to purchase cocaine from Roy Langley. J.A. at 644, 737–38. There was no testimony as to how much cash Baker planned to withdraw from this bank. But again, as the majority notes, there was testimony that Baker was "well off financially," *see ante* at 1259–60 & n. 8, and that Baker could afford to purchase "any amount" of cocaine.

A jury surely could reasonably conclude based upon this evidence that Baker had the intent and the means to purchase up to a kilogram of cocaine with the purpose of distributing it, and that his efforts to obtain the funds necessary to purchase the cocaine from Roy Langley constituted a substantial step toward achievement of that objective. Because the government produced sufficient evidence to support Baker's attempt conviction, I would also affirm the jury's guilty verdict on this charge.