**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-4290**

UNITED STATES OF AMERICA,

       Plaintiff – Appellee,

v.

JABRELL CRAIG SMITH,

       Defendant - Appellant.

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  William L. Osteen, Jr., District Judge.  (1:19-cr-00312-WO-1)

Argued:  September 24, 2021           Decided:  December 17, 2021

Before WILKINSON, WYNN, and HARRIS, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Harris joined. Judge Wynn wrote an opinion dissenting in part and dissenting from the judgment.

**ARGUED:**  John Scott Coalter, COALTER LAW P.L.L.C, Greensboro, North Carolina, for Appellant.  John McRae Alsup, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee.  **ON BRIEF:**  Matthew G.T. Martin, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee.

WILKINSON, Circuit Judge:

A jury convicted Jabrell Craig Smith of possessing heroin with intent to distribute and three offenses related to possessing a firearm. On appeal, Smith claims that the evidence against him should have been suppressed, that the district court abused its discretion in failing to give a lesser-included offense instruction, and that there was insufficient evidence supporting the jury's guilty verdict. For the following reasons, we affirm Smith's convictions.

I.

A.

On May 29, 2017, the Greensboro Police Department Street Crimes Unit (SCU) was conducting surveillance at a nightclub called Lucky 7's. Vincent Legrande, whom SCU knew to be a convicted felon, was inside. At approximately 2:00 a.m., SCU officers saw Legrande and two others, later determined to be Smith and Ja'kirus Staton, leave Lucky 7's in a black Chevrolet Malibu. Staton was driving, Smith was in the front right seat, and Legrande was in the back right seat.

Corporal James Buchanan and Detective Robert Mayo began following the Malibu in an unmarked police car. Buchanan radioed another SCU officer to run the license plate, which he identified as "Eagle, Eagle, Lincoln 7755," or "EEL 7755." The search for that plate showed that it was registered to a different car, leading the SCU team to believe that the Malibu was being driven with a fictitious registration. There is no dispute that Buchanan inadvertently transposed one letter while reading the license plate and that the Malibu had a valid license plate reading "ELL 7755."

2

Mayo and Buchanan followed the Malibu to a gas station, where they were eventually joined by several other SCU units. As they pulled into the parking lot, they saw Legrande get out of the back right passenger seat and walk over to a nearby car. Staton and Smith were already inside the convenience store.

The SCU units pulled around the Malibu and activated their blue lights, began exiting their cars, drew their guns, and yelled at Legrande to keep his hands up. Buchanan approached the Malibu and shined a flashlight inside. He saw a handgun protruding out from underneath the back of the front passenger seat to the footwell of the right-rear seat where the officers had observed Legrande. Detective Jason Lowe later observed another firearm, an Intratec 9mm handgun, on the floorboard of the Malibu's front-right passenger seat, where Smith had been sitting.

Meanwhile, Mayo and Sergeant Kory Flowers went inside the convenience store. Smith was standing in front of the cashier as if to pay for merchandise; Staton was standing behind Smith in line. Flowers approached Smith, advised him that he was being detained because of a fictitious tag, and placed him in handcuffs. Smith responded that the car was not his. At this time, neither officer knew about the handguns or the identities of Staton or Smith.

Officers detained Smith outside for about thirty minutes while they searched the Malibu. The officers seized both handguns, two cell phones, and a bag of heroin. Upon finding the heroin in the front-right door pocket, they arrested Smith and told him that he was being charged with trafficking. Smith asked how much the heroin weighed, and officers responded that it weighed 4.5 grams. Smith protested several times that the bag

3

weighed a gram and that officers should have weighed the heroin without the packaging, rendering a weight of 3.5 grams. A later laboratory test showed that the heroin weighed 3.32 grams.

B.

A grand jury indicted Smith of possessing with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(C); possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C § 924(c); being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2); and possessing a firearm subject to regulation under the National Firearms Act, in violation of 26 U.S.C. §§ 5845(a) and (e), 5861(d), and 5871.

Before trial, Smith filed a motion to suppress the evidence found in the car. He argued that officers lacked reasonable suspicion or probable cause to justify the seizure and that the subsequent search of the car violated his reasonable expectation of privacy. The district court denied the motion, finding that both the search and seizure of the car were lawful and that Smith lacked standing to raise a Fourth Amendment challenge.

Smith was then tried before a jury. The government presented, among other things, testimony of the SCU officers, DNA evidence linking Smith to the Intratec handgun, and videos depicting Legrande and Smith holding handguns. It also presented text messages found in a search of Smith's cell phone and expert testimony concluding that the heroin was unlikely to be for personal use.

At the close of the government's evidence, Smith moved for a judgment of acquittal due to insufficient evidence, which the district court denied. The defense then rested. Smith

4

requested a jury instruction on simple possession of heroin, a lesser-included offense of the possession with intent to distribute charge. The district court also denied that motion. The jury returned a guilty verdict on all counts, and Smith was sentenced to 138 months imprisonment.

## II.

Smith first argues that the evidence against him—the heroin, the two firearms, and the cell phone—should have been suppressed because the search and seizure of the Malibu were based on an unreasonable mistake about its license plate. Yet we must initially consider whether Smith even has standing to raise this Fourth Amendment challenge. Smith puts forth two grounds for standing: first, that he can challenge the search because he had a legitimate expectation of privacy in the Malibu and, alternatively, that he can challenge the seizure because he was also seized along with the car. We reject both theories. Because we hold that Smith lacks standing, we have no need to pass on the merits of his Fourth Amendment claim.

In assessing a district court's decision on a motion to suppress, we review factual findings for clear error and legal determinations de novo. *United States v. Lewis*, 606 F.3d 193, 197 (4th Cir. 2010). When, as here, a district court has denied a suppression motion, we view the evidence in the light most favorable to the government. *United States v. Palmer*, 820 F.3d 640, 648 (4th Cir. 2016). This entails giving "due weight to inferences drawn from those facts by resident judges and law enforcement officers." *Lewis*, 606 F.3d. at 197 (internal citation omitted).

A.

Fourth Amendment standing doctrine is carefully tailored to the privacy rights the Amendment was designed to protect. Smith claims he had a legitimate expectation of privacy in the Malibu that allows him to challenge its search. The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The text signals that "the Fourth Amendment is a personal right that must be invoked by an individual." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998). So we must ask whether a person "has had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge." *Rakas v. Illinois*, 439 U.S. 128, 133 (1978). To successfully bring that challenge, a defendant must show both "that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." *Carter*, 525 U.S. at 88; *see also United States v. Castellanos*, 716 F.3d 828, 832 n.3 (4th Cir. 2013). The defendant bears the burden of demonstrating his legitimate expectation of privacy in the area searched. *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980).

A legitimate expectation of privacy is not established solely through legitimate presence in a particular place. *Rakas*, 439 U.S. at 148. Nor does ownership of the item seized, by itself, confer a privacy interest in the area searched. *United States v. Manbeck*, 744 F.2d 360, 374 (4th Cir. 1984). Both legitimate presence and ownership of the items found should of course be considered in analyzing a legitimate expectation of privacy. *See Rakas*, 439 U.S. at 148; *Manbeck*, 744 F.2d at 374. But if a passenger asserts neither a property nor a possessory interest in the car and simultaneously disavows any interest in

6

the seized objects, that passenger normally has no legitimate expectation of privacy. *United States v. Rusher*, 966 F.2d 868, 874 (4th Cir. 1992).

We hold that Smith lacked a legitimate expectation of privacy in the Malibu. To start, Smith claimed no ownership interest in the Malibu. In fact, Smith explicitly disclaimed ownership when he told Flowers that it was Staton's car. Merely being in a car with the permission of its owner does not confer a legitimate expectation of privacy. *Rakas*, 439 U.S. at 148. To see why, imagine that Staton excluded Smith on his next night out. Or suppose that Staton picked up other friends at the gas station, leaving Smith without a ride. In neither situation could Smith complain that he was entitled to be a passenger. Therefore, there was no legitimate expectation that the car was his private space. Smith was merely an invited guest, and an invited guest can become uninvited at the owner's pleasure.

Nor does Smith claim ownership or possession of the weapons seized. At least concerning these items, Smith is in no better position than the passengers in *Rakas*, who conceded they were simply passengers and did not assert that they owned the objects seized (there, a rifle and shells). *See Rakas*, 439 U.S. at 130. Because "[t]hey asserted neither a property nor a possessory interest in the automobile, nor an interest in the property seized," the Supreme Court held that "petitioners' claims must fail." *Id.* at 148.

Nevertheless, Smith does claim ownership of the cell phone in the Malibu's center console and argues that leaving his phone in the car demonstrates his legitimate expectation of privacy. We agree this is "one fact to be considered," *Rawlings*, 448 U.S. at 105, but it does not by itself grant Smith standing. This is especially so given that Smith was no longer in the car when it was stopped. After leaving the Malibu, Smith lost control over his phone:

7

others could move or look through what had been left behind. When someone leaves personal belongings behind in another's car, he assumes the risk that the car's owner will consent to a search of the car or that the car's contents will come into plain view of the police. *See, e.g.*, *United States v. Santillan*, 902 F.3d 49, 62–63 (2d Cir. 2018). And since Smith claims that he knew police were following the Malibu, he was at least aware of the possibility that police would search the car. Fundamentally, "[a] person who cannot assert a legitimate claim to a vehicle cannot reasonably expect that the vehicle is a private repository for his personal effects." *United States v. Hargrove*, 647 F.2d 411, 412 (4th Cir. 1981).

It bears repeating: Smith was not a passenger of the Malibu at the relevant time. He was in the convenience store, not the car. This court has recognized that both bystanders and recent passengers have lesser privacy interests than passengers. *See United States v. Rose*, 3 F.4th 722, 730 (4th Cir. 2021) (no standing for one with "no greater privacy interest . . . than an airport bystander"); *United States v. Howard*, 413 F. App'x 559, 562 (4th Cir. 2005) (no standing for recent passenger). And with good reason. After all, "Fourth Amendment rights are personal rights which . . . may not be vicariously asserted." *Rakas*, 429 U.S. at 133–34 (quoting *Alderman v. United States*, 394 U.S. 165, 175 (1969)). So "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Id.* at 134.

Smith claims he had only briefly stepped into the convenience store to get the driver and the Malibu was still running, so he should be treated like a passenger. Yet this glosses

over the key point: Smith *left* the Malibu. The police did not stop the Malibu while Smith was in the car; nor was he just getting out as the police arrived. Instead, Smith was in the convenience store, well away from the Malibu. Though Smith claims that when he left the Malibu he intended to return, subjective intentions are not sufficient to establish a legitimate expectation of privacy. Otherwise, defendants could create impenetrable zones of privacy based solely on their say-so.

At any rate, Smith's intentions changed once he saw the police activity in the parking lot. The district court found that inside the convenience store, Smith "was attempting to deceptively ignore the activity in the parking lot as if he had nothing to do with [the Malibu] and was simply a patron unaware of and unconcerned by the activity outside the store." J.A. 291. We see no clear error in this finding, as Smith admitted that he had no money on him yet picked up a bag of chips and some candy because he just wanted to "throw [the police] off, like I was basically in there to buy something." J.A. 191–92. Smith cannot initially pretend to be unassociated with the Malibu and then later declare a privacy interest in it. Such conduct suggests that his assertion of privacy is contrived rather than legitimate.

An Amendment whose touchstone is one of reasonableness, *see* U.S. Const. amend. IV, will often be amenable to a totality of the circumstances test. Though it was Smith's burden to prove that he had a legitimate expectation of privacy, *see Rusher*, 966 F.2d at 874, he presented no evidence about whether he had previously used the Malibu, whether he had a key, or whether he regularly stored personal belongings in the vehicle. So there is no "special circumstance" that would give Smith a greater expectation of privacy than

9

passengers normally have. *Id.* Add Smith's non-ownership of the car, activity some distance away from the car, deceptive conduct with respect to the car, and the totality of the circumstances indicates that Smith did not have a legitimate expectation of privacy in the Malibu.

B.

Smith next argues that even if he lacks a legitimate expectation of privacy to challenge the search of the Malibu, he can still challenge the Malibu's seizure because, he says, stopping it based on a mistake about the license plate was unreasonable. But once again, Smith lacks standing. Smith was not in the Malibu when it was seized, and so he is not in a position to challenge its seizure.

A seizure occurs where, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Foster*, 824 F.3d 84, 88 (4th Cir. 2016) (quoting *United States v. Slocumb*, 804 F.3d 677, 681 (4th Cir. 2015)). "A person is seized within the meaning of the Fourth Amendment 'when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'" *Varner v. Roane*, 981 F.3d 288, 292 (4th Cir. 2020) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). Under this definition, the Malibu was seized when the two police cars pulled in behind it. But Smith was well away from the car at that time; *he* was not a part of the seizure he wishes to challenge.

Smith contends that he was part of the seizure of the car despite his distance away from it because a reasonable person in his position would not have believed that he was free to leave the gas station once police pulled in behind the Malibu. He notes that at least

10

seven to eight officers were present in the parking lot and that those officers made an overwhelming show of force with ballistic vests, drawn guns, and flashing blue lights. And he claims that he submitted to this show of authority outside by staying inside the convenience store instead of attempting to flee.

At the outset, Smith's argument conflates two very different things: the seizure of a car in a parking lot and the seizure of a pedestrian in a store. Just because a car has been seized does not mean that any nearby pedestrian has also been seized. *See United States v. Mendenhall*, 446 U.S. 544, 556–57 (1980) (differentiating between seizure of automobile and seizure of pedestrian). When police pulled in behind the Malibu, Smith was in the convenience store. As the district court noted, and Smith acknowledged, he had walked inside before seeing any emergency lights or police officers in the parking lot. *See* J.A. 189–90, 287. So we must focus on Smith's rights as a pedestrian. *See United States v. Allison*, 398 F. App'x 862, 864 (4th Cir. 2010).

Once we do that, it becomes irrelevant that Smith was recently a passenger in the Malibu. While the Supreme Court has held that passengers in cars are seized during traffic stops, *see Brendlin v. California*, 551 U.S. 249, 251 (2007), it has not extended that holding to former passengers who have since exited the vehicle. *Brendlin*'s holding rests in part on the recognition that once a police officer stops a car, "a sensible person would not expect a police officer to allow people to come and go freely from the physical focal point of an investigation into faulty behavior or wrongdoing." *Brendlin*, 551 U.S. at 257. The physical focal point of the investigation here was the Malibu, not the entire gas station or the associated convenience store. While it may well be that a person standing next to the

11

Malibu would not have felt free to leave, the same cannot be said for every individual at the gas station. So a person at the next gas pump would not have had her freedom restrained; nor would a customer who was inside buying a Snickers candy bar. The district court found Smith fell into this latter category: Smith was "free to move about" the store, "free to pretend to purchase merchandise," and "free to interact with the cashier." J.A. 295. Smith did not have his liberty restrained in the convenience store, and no more has standing to challenge the Malibu's seizure than any other customer there.

Citing *United States v. Jones*, 678 F.3d 293 (4th Cir. 2012), Smith makes much of the fact that he was aware that police were following the Malibu when it pulled into the gas station. But *Jones* did not give determinative weight to a defendant's awareness of police presence; it simply found a seizure given the "totality of the facts." *Id.* at 305. More importantly, *Jones* dealt with a driver "who had just emerged from and was still standing by the driver's door" when police approached. *Id.* at 297. Nothing in *Jones* suggests that the two passengers there—like Smith here—were seized when they walked away from the car before the police approached. *See id.* at 297, 302–03. In fact, *Jones* recognized that those passengers were "free to walk away," thus implying the passengers were not seized even though the driver was. *Id.* at 302.

Smith similarly claims his awareness of the police meant that he "was anything but an ordinary pedestrian buying an item at the gas station." Appellant's Br. at 26. As mentioned above, after reviewing body camera footage and observing Smith's testimony, the district court found that Smith attempted to convince police that he was indeed an ordinary pedestrian buying an item at the gas station. *See* J.A. 291. The district court's

12

finding indicates that Smith did not actually submit to the police's show of authority by staying inside. Staying inside was instead a deceptive attempt to avoid police scrutiny, as attempting to flee certainly would have drawn SCU attention. It also reinforces the fact that Smith was still at liberty to move through the store after the Malibu was seized. Smith could pretend to be a regular patron precisely because his freedom had not yet been restrained. As such, Smith cannot challenge the seizure of the Malibu.

Our holding here makes sense in terms of those basic interests the Fourth Amendment was meant to protect. Smith had neither a privacy interest in the car nor a personal interest in being free from detention since he was nowhere in or near the car at the time of its seizure. Thus, Smith lacks standing and his motion to suppress was properly denied.

## III.

Smith also challenges the district court's refusal to instruct the jury on the lesser-included offense of simple possession under 21 U.S.C. § 844. We review a district court's decision not to give a jury instruction for abuse of discretion. *United States v. Russell*, 971 F.2d 1098, 1107 (4th Cir. 1992).

## A.

A "defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." *Keeble v. United States*, 412 U.S. 205, 208 (1973). But he "is not entitled to a lesser-included offense instruction as a matter of course." *United States v. Wright*, 131 F.3d 1111, 1112 (4th Cir. 1997). Rather, district courts should ask whether "proof on the element

13

that differentiates the two offenses" is "sufficiently in dispute" to necessitate instructing the jury on the lesser offense. *United States v. Baker*, 985 F.2d 1248, 1258–59 (4th Cir. 1993). Such proof may be "sufficiently in dispute" when there is evidence of "sharply conflicting testimony" on that element or, in the absence of express conflict, when "the conclusion as to the lesser offense fairly may be inferred from the evidence presented." *Id.* at 1259 (quoting *United States v. Medina*, 755 F.2d 1269, 1273 (7th Cir. 1985)). In either case, the district court must consider the totality of the evidence presented.

The element that differentiates simple possession from drug trafficking is an intent to distribute. *Compare* 21 U.S.C. § 841(a)(1) *with id.* § 844. The question before the district court was therefore whether Smith's intent was sufficiently in dispute that a jury could reasonably find that he possessed the heroin but had no intent to distribute it. *See United States v. Seni*, 662 F.2d 277, 285 (4th Cir. 1981). There is no perfect demarcation between drug users and distributors—many are both—and district courts must enjoy discretion in policing this line. The district court here, "looking at all the evidence" presented throughout the trial, J.A. 835, concluded that Smith's intent to distribute was not sufficiently in dispute to demand submitting the simple possession offense to the jury. That conclusion was not an abuse of its discretion. While no one factor alone rules out the possibility of simple possession, the trial court concluded that, taken in toto, the evidence of mere possession here was weak, and that of intent to distribute was powerful.

The first factor the district court considered was the quantity of heroin. Smith was found with 3.32 grams of heroin—between eleven and thirty-two doses. Viewed in isolation, the amount of heroin is not dispositive; this is not a case where it is "so large as

14

to rule out the possibility of a finding of simple possession" as a matter of law. *United States v. Levy*, 703 F.2d 791, 793 & n.7 (4th Cir. 1983); *see also Seni*, 662 F.2d at 285. Indeed, the district court correctly recognized that this was not "such a large quantity of heroin that the quantity alone in and of itself" precluded simple possession. J.A. 834.

Even so, it found that the relatively large quantity in these circumstances was still probative of Smith's intent. While it might be theoretically possible that someone would possess this quantity for personal use, the government's expert testified it was highly unlikely. This is especially true given that Smith was arrested immediately after departing Lucky 7's, and as the district court observed, it is "close to inconceivable that a heroin addict . . . would take that entire quantity with him to go out to a nightclub." J.A. 835. Even if an addict did nothing but continuously inject heroin, it would still take two and a half days to use the quantity in Smith's possession. The government's expert also testified that the heroin cost more than a typical addict could afford and that a user would need an immense amount of self-control to possess such a quantity without overdosing. The district court did not abuse its discretion by considering these facts among the totality of the evidence.

Additionally, the defendant's specialized knowledge both of the heroin found here and of state drug law is revealing. Upon his arrest, Smith was told that the heroin weighed 4.5 grams and that he would be charged with trafficking. In response Smith repeatedly protested that the bag weighed one gram and the heroin only 3.5 grams—which, notably, is less than North Carolina's four-gram statutory threshold for trafficking. *See* N.C. Gen. Stat. § 90-95(h)(4)(a). Smith's acute awareness of the exact quantity of heroin in the car,

15

detailed knowledge about how much the packaging weighed, and apparent familiarity with North Carolina drug trafficking laws all support the inference that he intended to distribute.

The district court next noted the presence of a firearm. This circuit has often recognized that a firearm is much more likely to be present in a distributional scheme than in an instance of mere possession. *See, e.g.*, *United States v. Fisher*, 912 F.2d 728, 730–31 (4th Cir. 1990) ("[Defendant's] ownership of handguns is additional circumstantial evidence of his involvement in narcotics distribution" from which "the jury could infer [his] intent to distribute."); *United States v. Ward*, 171 F.3d 188, 195 (4th Cir. 1999) ("Guns are tools of the drug trade."). The firearm here was found in close proximity to the heroin, and Smith's DNA linked him directly to it. Due to "the unfortunate reality that drugs and guns all too often go hand in hand," the presence of both together is certainly probative of intent to distribute. *United States v. Lomax*, 293 F.3d 701, 706 (4th Cir. 2002).

And that is not all. Perhaps the most significant evidence the district court considered were Smith's text messages on the day of his arrest. These conversations strongly suggest that Smith intended to distribute the heroin in his possession that night. One correspondent, for example, asked Smith that day, "You working bud?", to which he replied "Yeah." Another asked, "How much for a half?" and he replied, "50"—the approximate price of a half-gram of heroin. There were at least two other similar inquiries that day—"Hey bud could you front a 40 for 100 Thursday?" and "Can I get 15?"—both of which the government's expert testified were references to purchasing narcotics. Another two messages were sent to arrange meeting places: one saying, "I'm coming from Thomasville. Where do you want to meet?" and the other coordinating to meet Smith at a

16

gas pump. One conversation, which took place only a few hours before Smith's arrest, arranged to put him in touch with three potential new customers. The government's expert testified that each of these messages was typical of an exchange between a drug dealer and customer and concluded that Smith's phone was likely being used to distribute drugs.

Finally, as the district court noted, there was "simply no evidence" of personal use or simple possession to cut against the overwhelming evidence of intent to distribute. J.A. 835. Unlike other cases where we have required the jury instruction on simple possession, Smith did not have any needles, bands, spoons, pipes, or other means of ingesting the heroin. *See Levy*, 703 F.2d at 792 (requiring an instruction on simple possession where four crack pipes were found at the defendant's home). Nor did Smith claim to have an addiction that would explain the large quantity of narcotics in his possession. *See Baker*, 985 F.2d at 1259 (requiring an instruction on simple possession where evidence made clear the defendant was an addict and "an abuser, not a distributor, of cocaine").

A defendant is not required to present, for example, evidence of the implements of personal use to be entitled to a jury instruction on simple possession. As noted, even in the absence of direct conflict in testimony, the instruction may still be appropriate if simple possession "fairly may be inferred from the evidence presented." *Id*. Evidence of personal use or the lack thereof nonetheless remains relevant, alongside all other evidence of intent, to this holistic inquiry. In *Wright*, for instance, we found that where there was significant evidence of intent to distribute—presence in an area where drug dealing was common, possession of tools to facilitate drug transactions, and large amounts of cash—combined with the complete absence of any evidence of personal use, the district court did not abuse

17

its discretion in finding that simple possession could not be fairly inferred. 131 F.3d at 1113.

Other courts of appeals have agreed that the lack of affirmative evidence of personal use "is not controlling," since "[w]hat matters is what a jury could have concluded from the evidence presented." *United States v. Hernandez*, 476 F.3d 791, 800 (9th Cir. 2007). And in making that determination, courts similarly look to "the evidence as a whole." *United States v. Gibbs*, 904 F.2d 52, 59 (D.C. Cir. 1990); *see also United States v. Milk*, 281 F.3d 762, 771 (8th Cir. 2002) (looking to all "the evidence presented at trial" to conclude that intent to distribute was not "seriously call[ed] into question"). Other circuits have thus required the lesser-included offense instruction—even when there was no affirmative evidence of the implements of personal use—if the government did not present any evidence of trafficking beyond a moderately large quantity of narcotics, such as distribution tools, cash, firearms, or testimony that the defendant could not have personally consumed that quantity. *See, e.g.*, *Hernandez*, 476 F.3d at 800–01; *Gibbs*, 904 F.2d at 59; *United States v. Lucien*, 61 F.3d 366, 376 (5th Cir. 1995). But those cases have also noted that the district court might properly refuse the lesser-included offense instruction if there was "additional evidence showing distribution." *Lucien*, 61 F.3d at 376 & n.16; *see also Hernandez*, 476 F.3d at 801. Accordingly, our sister circuits have not required the instruction in cases with both substantial evidence of distribution and a paucity of evidence suggesting mere personal use. *See, e.g.*, *Hernandez*, 476 F.3d at 800 (citing *United States v. Vaandering*, 50 F.3d 696, 703 (9th Cir. 1995)); *Lucien*, 61 F.3d at 374, 376 n.15 (citing *United States v. Harrison*, 55 F.3d 163, 167–68 (5th Cir. 1995)); *United States v. Smith*,

18

990 F.3d 607, 613–14 (8th Cir. 2021); *United States v. Lee*, 68 F.3d 1267, 1273 & n.6 (11th Cir. 1995).

Like those cases and *Wright*, here there was significant evidence of intent to distribute—the moderately large quantity of heroin, Smith's specialized knowledge of drug trafficking weights, presence of the firearm, and the text messages—and no countervailing evidence supporting an inference of personal use. It is all this evidence taken together, not any one factor alone, that supports the district court's conclusion that Smith's intent was not sufficiently in dispute to warrant a jury instruction on simple possession.

District courts must assess the strength of evidence when deciding whether to give any jury instruction. In making such decisions, they are "entitled to substantial deference, because a district court is much closer than a court of appeals to the pulse of the trial." *Russell*, 971 F.2d at 1104 (internal citation omitted). The word "discretion" underscores this truth. While we can provide trial courts with boundary lines to cabin their discretion, we cannot anticipate every circumstance they will encounter or attempt to perfectly script their decisions. And given the district courts' superior vantage point with respect to the evidence presented, we must show them enough deference that we not reverse merely because we might have come to a different result. *See Koon v. United States*, 518 U.S. 81, 99 (1996) ("[D]eference [is] owed to the judicial actor better positioned than another to decide the issue in question." (alterations adopted and citation omitted)); Henry J. Friendly, *Indiscretion About Discretion*, 31 Emory L.J. 747, 754 (1982) ("[T]he trial judge has discretion in those cases where his ruling will not be reversed simply because an appellate

court disagrees."). We thus give space to the trial court's discretion, asking only whether the judge ran out of bounds.

The district court here was squarely in bounds. It stated and applied the correct legal standard under *Baker* and *Wright*. *See* J.A. 834 (articulating the "sufficiently in dispute" standard); J.A. 837 (considering the totality of the evidence).[*] And it came to a reasonable conclusion given all the evidence before it. We must defer to its assessment.

## B.

A word as to the dissent. Our friend is intent on foreclosing the slightest possibility that there could be even a smidgeon of agreement between its position and our own. Not only is there no planetary difference in our views; there is no disagreement between the general propositions advanced by the dissent and the propositions upon which we have relied. Of course a defendant is "entitled" to a lesser-included-offense instruction "if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." *Keeble*, 412 U.S. at 208. Of course that standard is met if "proof on the element that differentiates the two offenses [is] sufficiently in dispute to allow a jury consistently to find the defendant innocent of the greater and guilty of the lesser offense."

---

[*] Contrary to the dissent's assertion, the district court did not "legally err[]" by resting on an incorrect reading of *Wright*. *See* Dissenting Op. at 31. As to any requirement of "affirmative evidence" of personal use to get a lesser-included instruction, the district court recognized that the issue was "not resolve[d]." J.A. 836 (quoting *United States v. Hall*, 397 F. App'x 860, 863 (4th Cir. 2010)). Accordingly, the district court "look[ed] at all the evidence," J.A. 835, "the totality of the facts," and "all th[e] circumstances," J.A. 837, rather than simply asking whether the defendant had produced affirmative evidence of personal use. As our opinion today makes clear, the production of such evidence is not a prerequisite to getting a lesser-included possessory instruction.

20

Dissenting Op. at 33 (quoting *Baker*, 985 F.2d at 1258–59). Of course "a sufficient dispute exists when the question of whether the element is met is 'capable of two answers.'" Dissenting Op. at 34 (quoting *Baker*, 985 F.2d at 1259; *Levy*, 703 F.2d at 793). And of course there is universal agreement on the centrality of a jury's role in resolving a "factual 'dispute in the evidence.'" Dissenting Op. at 35 (quoting *Levy*, 703 F.2d at 793). With all respect to our good colleague's seeming relish for some apocalyptic clash (errors here, there, and everywhere), our difference is grounded in the facts and evidence of this particular case, and the simple question of whether the district court abused its discretion in concluding that those facts did not justify the lesser-included instruction under this legal standard.

We have said that "[t]he district court has no discretion to refuse to give a lesser-included instruction" not just if "the defendant requests it," but "*if the evidence warrants the instruction*." *Baker*, 985 F.2d at 1259 (emphasis added). What the dissent fails to appreciate is that a criminal trial necessarily involves the interplay between judge and jury. *Some* instruction has to be given to the jury. The jury cannot instruct itself; the only one who can instruct it is the trial judge. And those instructions must be grounded to some extent in the evidence before the jury, lest it have nothing to weigh. *See Hopper v. Evans*, 456 U.S. 605, 611 (1982) ("The jury's discretion is thus channelled so that it may convict a defendant of any crime fairly supported by the evidence."). The trial judge *must* look at the totality of the evidence to determine "if the evidence warrants the [lesser-included] instruction." *Baker*, 985 F.2d at 1259. There is no way around it.

21

In turn, the only party which can review that decision is the court of appeals. And we are not to reconsider the decision de novo. It is inconceivable that the one who is charged with "choreograph[ing] a trial" would not be entitled to the "broad discretion" that is essential to its management. *United States v. Tindle*, 808 F.2d 319, 327 (4th Cir. 1986). The dissent chides us for using the words "deference" or "discretion," Dissenting Op. at 36, but the idea that the trial court lacks any meaningful discretion in these matters is simply not followed by this or any other circuit. District judges enjoy "wide discretion" in dealing with evidentiary matters generally. *See, e.g.*, *United States v. Abel*, 469 U.S. 45 (1984); *United States v. Heyward*, 729 F.2d 297, 301 n.2 (4th Cir. 1984). More specifically, the great majority of circuits agree that we review a district court's failure to give a lesser-included instruction—based on its evaluation of the evidence—for abuse of discretion. *See, e.g.*, *United States v. Busic*, 592 F.2d 13, 25 (2d Cir. 1978); *United States v. Vaquiz*, 810 F. App'x 151, 155 (3d Cir. 2020); *Russell*, 971 F.2d at 1107; *Lucien*, 61 F.3d at 372; *United States v. Colon*, 268 F.3d 367, 373 (6th Cir. 2001); *United States v. McCullough*, 348 F.3d 620, 624 (7th Cir. 2003); *Milk*, 281 F.3d at 768; *Hernandez*, 476 F.3d at 798; *United States v. Toledo*, 739 F.3d 562, 568 (10th Cir. 2014); *Lee*, 68 F.3d at 1273. And "deference . . . is the hallmark of abuse-of-discretion review." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997). None of this is to imply that the district courts' evidentiary rulings are sacrosanct, only that appellate judges should show a certain degree of appreciation for the individual who actually saw and heard the evidence in the course of conducting the trial.

The dissent instead conducts what walks and talks like de novo review, impermissibly "substitut[ing] its judgment for that of the district court." *United States v.*

22

*Mason*, 52 F.3d 1286, 1289 (4th Cir. 1995). Unlike rulings focused on a particular piece of evidence, *see, e.g.*, Fed. R. Evid. 403, 404, a ruling on instructions generally comes near the conclusion of a trial, thus giving the trial court a comprehensive view of the proceeding. In contrast to the holistic inquiry that the district court must and did undertake, the dissent adopts a very singular focus, scrubbing each piece of evidence individually: for example, noting that Smith's knowledge of the drug weights might have come not from experience but from simply overhearing the police, Dissenting Op. at 44–45; that the nearby gun does not compel a finding of intent to distribute, *id.* at 45; that it is possible Smith did not send the numerous text messages, *id.* at 46; and that the absence of spoons or needles does not mean he could not ingest the heroin, *id.* at 46–47. Maybe so. But each of these things certainly makes distribution more likely. And the district judge was entitled to consider all of them in deciding whether the evidence warranted the lesser-included instruction. Considering each piece of evidence in isolation neglects the force of evidence in combination. And appellate review may not then pick the flower and ignore the garden.

The dissent succumbs to the dangers of selectivity in yet another way. It quite fails to adopt a holistic view of precedent. It is apparent that the dissent favors *Levy*, on which it places almost singular controlling weight. It is equally obvious that the dissent disfavors *Wright*, another of our relevant precedents. But we are not at liberty to credit and discredit precedent in such arbitrary fashion. To justify doing that, the dissent states that *Levy* controls because it is the earlier precedent. Dissenting Op. at 38 (citing *United States v. Spinks*, 770 F.3d 285, 290 (4th Cir. 2014)). But that rule only applies if there is "direct" and "irreconcilable conflict" between the two precedents. *McMellon v. United States*, 387

23

F.3d 329, 333, 334 (4th Cir. 2004). Rather than readily finding direct conflict, the proper approach is to harmonize circuit precedent. Bryan A. Garner et al., The Law of Judicial Precedent § 36, at 300 (2016); *see also Citizens for Resp. & Ethics in Washington v. Fed. Election Comm'n*, 993 F.3d 880, 893 (D.C. Cir. 2021) ("When faced with a claim of conflicting precedents, we must whenever possible harmonize later decisions with existing authorities to avoid creating unnecessary conflicts.").

*Wright* is reconcilable with *Baker* and *Levy*, and we must thus take our guidance from all the relevant precedents. In all three cases, the district judge was tasked with determining whether "a jury [could] fairly infer from the evidence presented that [the defendant] intended to possess the [narcotics] for his personal use," and each canvassed the totality of the evidence to make this determination. *Wright*, 131 F.3d at 1113; *see also Baker*, 985 F.2d at 1259; *Levy*, 703 F.2d at 792. The courts came to opposite conclusions— the lesser-included instruction was required in *Baker* and *Levy*, but not in *Wright*—due only to the facts of each particular case. *See Wright*, 131 F.3d at 1113 (concluding that the middling quantity of cocaine could not alone support an inference of personal use given "the powerful evidence of distribution"); *Baker*, 985 F.2d at 1259–60 (concluding that the evidence of addiction and financial means to buy in bulk could support an inference of personal use, given the disputed credibility of prosecution witnesses); *Levy*, 703 F.2d at 792 (concluding that evidence of crack pipes at Levy's home could support, and the quantity was not so large as to rule out, an inference of personal use).

We have further harmonized these cases by rejecting squarely the more aggressive reading of *Wright*, one that would *require* affirmative evidence of personal use to merit the

24

lesser-included jury instruction. *Supra* at 17–18. All three cases employ a standard, not a bright-line rule. All three require looking at all the evidence in toto to determine if there is "a substantial basis for an inference" of personal use before requiring a lesser-included instruction. *Levy*, 703 F.3d at 793; *see also Baker*, 985 F.2d at 1259; *Wright*, 131 F.3d at 1113. As Professor Sullivan explained, standards "giv[e] the decisionmaker more discretion than do rules" and "allow the decisionmaker to take into account all relevant factors or the totality of the circumstances." Kathleen M. Sullivan, *The Justices of Rules and Standards*, 106 Harv. L. Rev. 22, 58–59 (1992). Indeed, that discretion can work to a defendant's advantage, because it is not displaced by any rule that the absence of the implements of personal use precludes a lesser-included possessory instruction. *See supra* at 17–18.

There is an old axiom in the executive branch of government: stay in your lane. The axiom is meant among other things to allocate tasks to the agency best able to perform them. The trial court performed its duty very well here for all the reasons we have noted. To reverse it, we would have to leave the appellate lane, which would collide the trial and appellate roles to the long-term detriment of both.

IV.

Lastly, Smith argues that there was insufficient evidence supporting the jury's guilty verdict. We review de novo a district court's decision to deny a motion for a judgment of acquittal based on sufficiency of the evidence. *United States v. Reed*, 780 F.3d 260, 269 (4th Cir. 2015). We examine that evidence "in cumulative context," not "piecemeal fashion." *United States v. Burgos*, 94 F.3d 849, 863 (4th Cir. 1996) (en banc). And "if,

25

viewing the evidence in the light most favorable to the government, substantial evidence supports" the jury's verdict, then we must uphold it. *United States v. Kiza*, 855 F.3d 596, 601 (4th Cir. 2017). Substantial evidence is that which "a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Hickman*, 626 F.3d 756, 763 (4th Cir. 2010) (quoting *United States v. Young*, 609 F.3d 348, 355 (4th Cir. 2010)). Any defendant bringing a sufficiency challenge bears "a heavy burden," and reversal for insufficient evidence "is reserved for the rare case where the prosecution's failure is clear." *United States v. Ashley*, 606 F.3d 135, 138 (4th Cir. 2010) (citations omitted).

Smith chiefly disputes the sufficiency of the evidence that he was in constructive possession of the drugs and weapon. To sustain Smith's drug and firearm convictions, the government must prove *inter alia* that Smith constructively possessed the heroin and the Intratec firearm found in the Malibu. *See United States v. Herder*, 594 F.3d 352, 358 (4th Cir. 2010). It can do so through direct or circumstantial evidence. *United States v. Al Sabahi*, 719 F.3d 305, 311 (4th Cir. 2013). "A person may have constructive possession of contraband if he has ownership, dominion, or control over the contraband or the premises or vehicle in which the contraband was concealed," and the government must provide proof that "defendant had knowledge of the presence of the contraband." *Herder*, 594 F.3d at 358.

There is ample evidence here that Smith constructively possessed both the heroin and the Intratec firearm. Smith was sitting near both the drugs and the firearm: the former was visible in his seat's door pocket, and the latter was in plain view at his feet. Though

26

proximity standing alone is not sufficient evidence, juries have every right to consider proximity as part of their analysis. *See United States v. Shrader*, 675 F.3d 300, 308 (4th Cir. 2012). And proximity does not stand alone here. As to the heroin, Smith repeatedly engaged officers in discussions about its weight, indicating awareness of the heroin's existence, knowledge of drug packaging, and familiarity with state-law drug trafficking thresholds. His text messages also strongly suggested that he was involved in selling controlled substances. As to the Intratec firearm, Smith had appeared in a video with a codefendant who was holding the gun, which suggests that he had prior knowledge of and ready access to the weapon. The mechanical system under the front seat would have made it difficult for the Intratec to have shifted under Smith's feet accidentally or to have been put there from behind. DNA analysis also demonstrated that it was 2,600 times more likely that Smith, as opposed to a random individual, was a contributor to the DNA on the weapon. Finally, because "drugs and guns all too often go hand in hand," *Lomax*, 293 F.3d at 706, knowledge of one often permits an inference of knowledge of the other. Taken together, this evidence was more than sufficient for the jury to convict Smith.

V.

For the foregoing reasons, we affirm the district court's judgment.

*AFFIRMED*

27

WYNN, Circuit Judge, dissenting in part and dissenting from the judgment:

The only issue I disagree with the majority on is whether the trial court should have instructed the jury on the lesser-included offense of simple possession. That's because if we maintain our limited roles as appellate judges and likewise require the district court to "stay in [its] lane," Majority Op. at 25, and not the jury's lane, our precedent requires that a jury decide whether Smith was guilty of the lesser or greater offense.

If the majority took its own advice to "stay in [its] lane," then it would have come to the same conclusion. But instead, the majority follows a different axiom: "*Do as I say, not as I do.*" Four relevant examples stand out.

First, the majority says we should defer to the trial court, but then it proceeds to do the district court's work for it. Second, the majority states that "we must . . . take our guidance from all the relevant precedents," *id.* at 24, but then it simply ignores the controlling precedent of this Court. Third, the majority requires courts to "look at the totality of the evidence," *id.* at 21, but then it ignores critical evidence and inferences in the record. And fourth, the majority says that the jury must resolve "factual dispute[s] in the evidence," *id.* (internal quotation marks omitted), but then it then turns around and weighs the evidence itself.

I.

As appellate judges, we should remind ourselves that there are important reasons for requiring lesser-included-offense instructions in criminal trials. If the jury is "presented with only two options: convicting the defendant of [a crime] . . . or acquitting him outright," but "one of the elements of the offense charged remains in doubt," the "jury is

28

likely to resolve its doubts in favor of conviction" if the "defendant is plainly guilty of *some* offense." *Keeble v. United States*, 412 U.S. 205, 212–13 (1973) (emphasis in original). In situations like these, we "cannot say that the availability of a third option—convicting the defendant of [a lesser-included offense]—could not have resulted in a different verdict." *Id.* at 213.

With this basic principle in mind, I now address the four ways in which the majority opinion tells us to "Do as I say, not as I do."

A.

First, the majority says we must defer to the trial court, but then it proceeds to do its job for it. Before today, there was a great deal of confusion within this Circuit over whether defendants charged with intent to distribute drugs were required to produce or point to affirmative evidence of drug use to be entitled to a possession instruction. The source of this confusion is our much-derided opinion in *United States v. Wright*, 131 F.3d 1111 (4th Cir. 1997).

Numerous courts—including this one—have recognized that *Wright* can be read as holding that "a jury can *never* rationally convict for mere possession in the absence of *substantial affirmative evidence* of non-distribution." *United States v. Hall*, 397 F. App'x 860, 863 (4th Cir. 2010) (per curiam) (emphases added). To its credit, the majority properly recognizes that "the lack of affirmative evidence of personal use 'is *not* controlling.'" Majority Op. at 18 (emphasis added) (quoting *United States v. Hernandez*, 476 F.3d 791, 800 (9th Cir. 2007)). After all, possession "may be [fairly] inferred from the evidence presented" by the Government. *United States v. Baker*, 985 F.2d 1248, 1259 (4th Cir. 1993)

29

(quoting *United States v. Medina*, 755 F.2d 1269, 1273 (7th Cir. 1985)). And requiring a defendant to produce affirmative evidence of drug use or addiction would prejudice their ability to argue against both simple possession and distribution at trial. *See United States v. Nur*, 799 F.3d 155, 159 (1st Cir. 2015) ("Clearly, though, the law cannot be that a defendant must admit to the lesser crime in order to obtain the lesser-included-offense instruction."). Thus, we all agree that courts cannot require defendants to dig their own graves.

But while the majority acknowledges this flaw in *Wright* by recognizing the correct legal standard on affirmative evidence, the district court did not. Instead, the district court expressed confusion about what standard it should apply, noting an apparent conflict between *United States v. Baker* and *Wright*. The district court thought that under "*Baker* standing alone . . . there's an argument that the instruction is required" here. J.A. 833–34. However, the district court concluded that this case was controlled by *Wright*, which seemed to require a defendant to offer "considerable *affirmative evidence unrelated to drug quantity* from which the jury could have reasonably inferred [that] the defendant possessed the drugs solely for personal use" to be "entitled to an instruction on simple possession." J.A. 836 (emphasis added) (quoting *Hall*, 397 F. App'x at 863). And "after looking at the factors in *Wright*, in this particular case the absence of any [affirmative] evidence that this was just a simple possession"—other than expert testimony regarding drug quantity— meant Smith's instruction request was barred. J.A. 834–37.

Despite the clear evidence to the contrary, the majority exits the "appellate lane" and attempts to prop up the district court's work by claiming that the district court's

30

decision did not "rest[] on an incorrect reading of *Wright*." Majority Op. at 20 n.1. As support, it primarily points to the district court's statements that it considered "the totality of the facts" and "all the evidence," J.A. 835, 837, "rather than simply asking whether the defendant had produced affirmative evidence of personal use," Majority Op. at 20 n.1.

But that is simply wrong. It is clear from the transcript that the district judge was "looking at all the evidence" to determine if there was, in fact, affirmative evidence of drug use. *See* J.A. 835. It ultimately concluded there was "no [drug] paraphernalia in the [Malibu]," and "no evidence anybody was using [drugs]." J.A. 835. And in case there was any doubt about what the court was doing, it then contrasted this case with *Baker* and *United States v. Levy*, 703 F.2d 791 (4th Cir. 1983). It noted that, "as described in *Wright*," both of these cases required a lesser-included instruction after finding "clear[] [affirmative] evidence of simple possession in terms of use of the controlled substance." J.A. 835; *see also Wright*, 131 F.3d at 1115–16 (distinguishing *Baker* and *Levy* as cases involving "considerable affirmative evidence unrelated to drug quantity"). Because "none of [that] is present" here, no instruction was required. J.A. 835.

Thus, the district court rested its analysis on the very reading of *Wright* that we now unanimously reject. *See* Majority Op. at 17–18. When a district court legally errs in this way, we must vacate its decision and remand for further proceedings unless the error was harmless. *See United States v. Hurwitz*, 459 F.3d 463, 474–82 (4th Cir. 2006) (vacating a conviction and remanding for further proceedings when the district court's legal error eliminated a key jury instruction from consideration). But the majority—swerving outside the appellate lane once more—ignores the district court's legal error, Majority Op. at 20

31

(finding the district court "applied the correct legal standard"), blazes past this step, and holds that we "must defer" to the district court's "reasonable conclusion given all the evidence before it," *id.*

The majority's failure to recognize the fundamental mismatch between its own holding and the district court's conclusions thus leads it to yet another error. We recently noted that "factual findings made in the application of an incorrect legal standard *are not accorded any deference.*" *Arita-Deras v. Wilkinson*, 990 F.3d 350, 356 (4th Cir. 2021) (emphasis added); *see also United States v. Brown*, 934 F.3d 1278, 1307 (11th Cir. 2019) ("If a district court applies an incorrect legal standard in reaching a factual conclusion, the resulting finding is not insulated by the clear-error standard."). Thus, because the district court applied the wrong legal standard, we must either vacate and remand in light of that error,[1] or refuse to defer to its factual findings. The majority—now driving on the shoulder—errs by choosing neither.

B.

Second, the majority says we must "adopt a holistic view of precedent" then disregards our binding precedent. Majority Op. at 23. To wit, though the majority correctly finds our decision in *United States v. Baker* controlling, it ignores critical language in that opinion and *United States v. Levy*.

---

[1] That error was not harmless. As explained below, though the Government's evidence "was powerful and strongly indicative" of distribution, "we cannot say that no reasonable juror could have concluded" that Smith was guilty of possession but innocent of distribution. *Cf. Hurwitz*, 459 F.3d at 481.

32

I agree with the majority that, under *Baker*, "[f]or the defendant to be entitled to a lesser-included offense, the proof on the element that differentiates the two offenses must be sufficiently in dispute to allow a jury consistently to find the defendant innocent of the greater and guilty of the lesser offense." *Baker*, 985 F.2d at 1258–59. I also agree this could be shown by presenting "sharply conflicting testimony" on the disputed element or by showing that "the conclusion as to the lesser offense fairly may be inferred from the evidence presented." *Id.* at 1259 (quoting *Medina*, 755 F.2d at 1273).

But our agreement ends there, because the majority believes that satisfying either of these conditions means that the element is "sufficiently in dispute." Majority Op. at 14. But these conditions are evidentiary *avenues* to show a dispute, not evidentiary conditions that automatically establish a *sufficient* dispute.

To make this plain, consider the not uncommon example of where the Government presents multiple witnesses with detailed eyewitness accounts to show that a defendant intended to distribute drugs. If the defendant then got on the stand and categorically denied those accounts but otherwise offered no proof, there would be sharply conflicting testimony, but perhaps not a "sufficient" dispute. It's even harder to make any sense of the majority's second condition: that an element is sufficiently in dispute when "the conclusion as to the lesser offense fairly may be inferred from the evidence presented." *Id.* (quoting *Baker*, 985 F.2d at 1259). The majority essentially says that a sufficient dispute exists when the jury could rationally conclude that a defendant is guilty of the lesser offense. But this is just a rephrasing of *Baker*'s overall test. In effect, the majority is claiming that an element is sufficiently in dispute when one can fairly infer that it is sufficiently in dispute. This is

33

entirely circular. Because these evidentiary *avenues* don't explain what "sufficiently in dispute" means, we must look elsewhere in *Baker* for an explanation.

According to *Baker*, a sufficient dispute exists when the question of whether the element is met is "capable of two answers." *Baker*, 985 F.2d at 1259 (quoting *Levy*, 703 F.2d at 793). And that question is capable of two answers "if there is *any* evidence fairly tending to bear upon the lesser included offense, *however weak that evidence may be*."[2] *Id*. (emphases added) (quoting *United States v. Gibbs*, 904 F.2d 52, 58 (D.C. Cir. 1990)) (cleaned up); *see also United States v. Humphrey*, 208 F.3d 1190, 1207–08 (10th Cir. 2000) (holding the same), *abrogated on other grounds by Arizona v. Gant*, 556 U.S. 332 (2009). Framed in the converse, unless "the evidence, as a matter of law, . . . 'rule[s] out a possible inference of'" simple possession, an instruction must be given. *Baker*, 985 F.2d at 1259 (quoting *Levy*, 703 F.2d at 793 n.7); *Nur*, 799 F.3d at 160 (requiring a simple drug possession instruction where the evidence did not "necessarily" "compel a jury to conclude" that the defendant intended to distribute those drugs).

The reason for this abundance of caution, of course, is to "preserve the jury's fact-finding role." *Nur*, 799 F.3d at 158; *United States v. Arnt*, 474 F.3d 1159, 1165 (9th Cir.

---

[2] Though the majority proclaims itself the champion of "holistic" review of our precedent, Majority Op. at 23, it never bothers to address this language, or *Baker*'s converse framing described below. Neither statement is inconsistent with *Baker*'s overarching test, which requires a lesser-included instruction if the jury could "*consistently* . . . find the defendant innocent of the greater and guilty of the lesser offense." *Baker*, 985 F.2d at 1258–59 (emphasis added). The point is that if there is *any* evidence that could consistently support a finding that the defendant is "guilty only of simple possession," the question must be submitted to the jury, no matter how "weak" we think that evidence may be. *Id.* at 1259 (quoting *Gibbs*, 904 F.2d at 58, 59).

2007) ("The integrity of the jury's fact-finding role undergirds our requirement that a lesser-included offense instruction be given when supported by law and the evidence."). A factual "dispute in the evidence . . . requires resolution by the jury." *Levy*, 703 F.2d at 793 n.4 (quoting *United States v. Brischetto*, 538 F.2d 208, 210 (8th Cir. 1976)); *see also id.* at 792 (noting this Court cannot "indulg[e] in the jury's function of weighing probabilities" (footnote omitted)). So, as long as "there is some evidence to support the jury instruction, it is the jury's province to determine which evidence it believe[s] most accurately reflect[s] the events" at issue. *Arnt*, 474 F.3d at 1164–65. Courts "may not intrude on th[is] province" because the jury "may find credibility in testimony that the judge may consider completely overborne by the 'simply overwhelming' evidence of the prosecutor." *United States v. Thornton*, 746 F.2d 39, 47 (D.C. Cir. 1984) (citation omitted).

The majority elides this point, disregarding our prior precedent in *Levy* in the process. Instead, it claims that the "*district court[]* must enjoy discretion in policing" the line "between drug users and distributors," Majority Op. at 14; and "the *district court* must consider the totality of the evidence presented" while weighing the "evidence of mere possession" against "that of intent to distribute," *id.* But that's simply wrong. Weighing the evidence is a jury function. *See Levy*, 703 F.2d at 793 n.4 ("We hold that a dispute in the evidence . . . requires resolution by the jury." (citation omitted)).

But the majority avoids this issue by following another axiom: "*If you don't like the issue, make it one that you do like.*" So, it changes the issue that is before us from, "Is it the jury's role to weigh the evidence?" to "Can we disturb the district court's discretionary

35

evidence weighing?" *See* Majority Op. at 13–20 (referring to this "discretion" or "deference" at least thirteen times).

For example, the majority contends that because "a district court is much closer than a court of appeals to the pulse of the trial," we must "give space to the trial court's discretion, asking only whether the judge ran out of bounds." *Id.* at 19–20. True, but what does that have to do "with the price of tea in China?" Even if these vague propositions were instructive, the very cases the majority cites as support—*United States v. Russell*, 971 F.2d 1098 (4th Cir. 1992), and *Koon v. United States*, 518 U.S. 81 (1996)—reveal how far afield the majority's position is. *Russell* concerned a challenge to the district court's Fed. R. Evid. 402–04 rulings. *Russell*, 971 F.2d at 1104. *Koon* involved a challenge to the district court's sentencing decisions. *Koon*, 518 U.S. at 99. Both issues in those cases were clearly within the province of the trial court. However, weighing the evidence is not. *Levy*, 703 F.2d at 793 n.7. That's why the "district court *has no discretion* to refuse to give a lesser-included instruction if the evidence warrants the instruction and the defendant requests it." *Baker*, 985 F.2d at 1259 (emphasis added).

Nonetheless, the majority contends that other circuits "have not required the instruction" after weighing "substantial evidence of distribution" against a "paucity of evidence suggesting mere personal use." Majority Op. at 18. But the very first case it cites for this proposition, *United States v. Hernandez*, held exactly the opposite. In that case, the Ninth Circuit instead stated "that a district court *may not weigh the evidence* in determining whether to give a lesser included offense instruction." 476 F.3d at 800 (emphasis added). It then held that based on the quantity of drugs and a lack of other evidence of distribution,

the district court abused its discretion by not providing a jury instruction for simple possession. *Id.* at 800–01 ("That decision was properly a decision for the jury, not for the district court, to make.").

Similarly, in *United States v. Lucien*, 61 F.3d 366 (5th Cir. 1995)—another case the majority relies on—the Fifth Circuit held "it is *the jury's* role to decide whether the evidence supports simple possession or possession with intent to distribute" unless the fact pattern is "extreme." *Id.* at 376 (emphasis in original). It then found that the defendant was entitled to a lesser-included instruction even though the "amount seized was a distributable quantity," "$1200 in cash and . . . two guns [were] found in the [defendant's] apartment," "foil wrappings [were] found with the cocaine base," and the defendant "was flushing the drugs down the toilet when the police arrived." *Id.* at 375. These cases simply do not support the majority's contention that a district court may weigh "substantial evidence" of distribution against minor evidence of possession without usurping the jury's role.[3]

Perhaps sensing this disconnect, the majority suggests that evidence weighing is permitted by our precedent in *United States v. Wright*. *See* Majority Op. at 17–19, 24. In *Wright*, the defendant was arrested in a "'hot spot' for illegal drug activity" after fleeing from police. *Wright*, 131 F.3d at 1112. During his flight, Wright abandoned a plastic bag containing 3.25 grams of crack cocaine worth between $300 and $600 and comprising

---

[3] The remaining two cases from other circuits cited by the majority are not to the contrary. These were cases where *no* evidence or reasonable inference of possession was presented or possible. *See United States v. Smith*, 990 F.3d 607, 613–14 (8th Cir. 2021); *United States v. Lee*, 68 F.3d 1267, 1273 (11th Cir. 1995).

about thirty dosage units. *Id.* When police searched Wright, they found a razor blade with cocaine residue and $135 in twenty- and five-dollar bills; however, police recovered no crack pipe or scales. *Id.* Though the dissent pointed out that there were plenty of inferences that could be drawn in favor of simple possession on these facts—including the low drug weight, lack of a scale, and the fact that the crack was not packaged in units for sale, *id.* at 1117 (Murnaghan, J., dissenting)—the *Wright* majority held that the evidence of possession was "simply insufficient" when placed "*against the backdrop* of the powerful evidence of distribution," *id.* at 1113 (majority opinion) (emphasis added).

But to the extent that the majority relies upon *Wright* for the proposition that district courts can properly weigh evidence when deciding whether to require a lesser-included-offense instruction, *see* Majority Op. at 17–19, it was barred by our prior precedent in *Levy* and *Baker*, *see United States v. Spinks*, 770 F.3d 285, 290 (4th Cir. 2014) (explaining that "if two circuit precedents conflict, the earlier one . . . controls over the later"). In *Levy*, we expressly held that "weighing the probabilities" is "the jury's function." *Levy*, 703 F.2d at 792. Therefore, the "question, mere possession or possession with intent to distribute," "requires resolution by the jury"—*not* "resolution by the trial judge." *Id.* at 793 nn.4 & 7. We then affirmed this principle in *Baker*, reiterating that a lesser-included instruction *must* be submitted to the jury "if there is *any* evidence fairly tending to bear upon the lesser included offense." *Baker*, 985 F.2d at 1259 (emphasis added) (citation omitted). Because these two decisions barred district courts from weighing evidence when deciding whether to issue such instructions, *Wright*, which was later decided, could not authorize this practice.

38

The majority criticizes this conclusion because it believes "*Wright* is reconcilable with *Baker* and *Levy*." Majority Op. at 24. However, it does not explain how *Wright*—which weighed evidence of distribution and possession—is reconcilable with *Baker* and *Levy*—which expressly forbade such weighing. Instead, following the "if you don't like the issue, make it one that you do like" principle, the majority focuses on the fact that all three cases applied the same overarching legal rule—making them automatically reconcilable. *See id.* But the overarching rule is not in dispute. What is in dispute is *how* district courts apply that rule; specifically, whether they may weigh the evidence themselves when deciding whether *Baker*'s test is met. *Levy* and *Baker* say they cannot.

The majority counters that some weighing must be allowed because "[t]he jury cannot instruct itself; the only one who can instruct it is the trial judge. And those instructions must be grounded to some extent in the evidence before the jury, lest it have nothing to weigh." *Id.* at 21. In effect, the majority is conflating two distinct tasks: (1) determining "if there is *any* evidence fairly tending to bear upon the lesser included offense, *however weak that evidence may be*," *Baker*, 985 F.2d at 1259 (emphases added) (citation and internal quotation marks omitted); and (2) "weighing the probabilities," *Levy*, 703 F.2d at 792. As the majority recognizes, the former requires looking at the totality of the evidence. *See Nur*, 799 F.3d at 159 (holding district courts deciding whether to issue a lesser-included possession instruction must assess all "the possible constructions of the evidence that are rationally possible"). But examining the totality of the evidence is not the same thing as weighing it. Only the former is properly a task for the district court; the latter is "the jury's function." *Levy*, 703 F.2d at 792.

39

In the end, the majority's standard permits district courts to stray from their lanes by inappropriately weighing the evidence of distribution against that for possession. In doing so, it disregards binding precedent and creates a circuit split.[4] In case there was any doubt that this is what the majority intended, it too strays from its lane by proceeding to weigh the evidence on the facts here.

C.

That brings us to the present case. Because the majority's opinion skims over many of the relevant facts, I supply additional necessary facts here. What a fair consideration of all of the relevant facts reveals is that even the majority's improper dose of deference is not enough to support affirmance.

1.

Smith was charged with possession with intent to distribute heroin after police recovered a single plastic baggie containing heroin from the Malibu's front passenger door pocket. Though Smith did not own the vehicle, he had been sitting in the front passenger seat before it was seized. Police also recovered an Intratec 9mm firearm from underneath the same seat. The heroin itself was not packaged in "bindles" for sale, and no "cut" or scales were seized that would be needed to divide the heroin for distribution. J.A. 448, 610, 632. Smith had no cash on him. Nor did Smith have any typical drug paraphernalia associated with heroin use, such as needles, spoons, tourniquets, or belts. However, heroin

---

[4] Research has not revealed an out-of-circuit case supplanting the jury's role in the manner the majority does here.

can be smoked, snorted, or orally ingested, which would not require any of those implements. Some users choose to get high without the use of implements such as needles because "they don't want to be stigmatized with a needle" or risk catching blood-borne diseases that can be transferred "with the sharing of needles." J.A. 612.

There was extensive expert testimony on the amount of heroin seized. Special Agent Razik testified that the 3.32 grams of heroin recovered from the baggie would be between eleven and thirty-three dosage units.[5] On the street, this approximate amount of heroin is commonly referred to as an "8 ball." J.A. 616. Although it was "highly unlikely" to be an end-user amount, "it [wa]s possible." J.A. 615. Razik himself had purchased this much heroin multiple times as an undercover buyer. According to Razik, purchasing this much is "kind of like shopping at Costco"—"[i]f you go to Costco, you get more product, but you get a better deal on it." J.A. 616. Though most heroin users "normally" do not have the money to purchase their heroin in bulk, "some of them do." J.A. 635.

After Smith was arrested, he was transferred to jail. He was placed in the main holding area, which was next to the officer booking room. The booking room houses a scale used to weigh drugs. After the officers used the scale to find the heroin weighed 4.5 grams in its baggie, they spoke to the magistrate. The area where the police spoke to the magistrate was "open to the holding area," J.A. 95, such that Smith was able to hear the conversation. Afterward, Officer Jason Lowe informed Smith of the trafficking charge.

---

[5] Razik actually said thirty-two doses, but that appears to be based on his mistaken belief that only 3.2 grams of heroin were seized.

41

Smith asked him how much the heroin weighed, and Lowe said 4.5 grams. Smith then asked Lowe if they weighed it in the baggie. According to several officers, Smith also stated that the bag weighed a gram and the heroin weighed 3.5 grams without the bag.

At trial, the Government presented Snapchat videos that showed Legrande and Smith holding handguns—though none showed Smith holding the Intratec weapon found under his seat—and expert testimony that drug dealers often possess firearms. The Government also introduced DNA evidence that provided "moderate support for inclusion of Mr. Smith as a potential contributor" to the Intratec firearm. J.A. 747. An expert testified that the DNA retrieved from the firearm was a "low-level DNA sample" that was about 1/15 of the lab's usual target amount for amplification. J.A. 761–62. The lab test did not identify a "major contributor" of DNA to the firearm, defined as "when a contributor to a mixture is greater than either 50 percent or two times the next contributor." J.A. 762–63.

Finally, the Government introduced fifteen incoming and outgoing text messages into evidence. These messages were obtained from a white LG cell phone seized from the Malibu's center console which contained a link to a Google Photo account listing Smith as the account holder. Special Agent Razik read and interpreted these messages for the jury, but noted at the outset that drug dealers "may use telephones that are not subscribed in their name" to disguise their identity. J.A. 618. Razik was also careful to specify that it was the "user of the phone" that sent these messages because he did not know who sent them. J.A. 621, 636.

With this context in mind, I turn to the majority's application of its erroneous legal standard to these facts.

2.

It should come as no surprise that the majority's "Do as I say, not as I do" mantra also infects its application of its flawed legal standard to Smith's case. To start—in what amounts to the majority's third "Do as I say, not as I do" exercise—the majority repeatedly stresses the need to conduct a "holistic inquiry" and consider "the totality of the evidence," Majority Op. at 21, 23, yet it ignores any inferences or facts that contradict its distribution narrative. For example, while the majority is very willing to draw inferences in favor of distribution, it forgets to do the same for possession, as it must to evaluate this issue. *See Levy*, 703 F.2d at 792–93 (recognizing both inferences of an intent to distribute and inferences supporting simple possession); *Nur*, 799 F.3d at 159 (holding courts deciding whether to issue a lesser-included-offense instruction must assess "the possible constructions of the evidence that are rationally possible"). To wit, the majority finds Smith's intent to distribute supported by inferences from: the "relatively large quantity" of heroin, Smith's awareness of the "exact quantity of heroin in the car" and apparent familiarity with the state trafficking thresholds, the presence of the Intratec firearm linked to Smith by proximity and DNA, and "Smith's text messages." Majority Op. at 14–18. It also finds "*no* countervailing evidence supporting an inference of personal use," such as

43

drug paraphernalia or testimony regarding Smith's addiction.[6] *Id.* at 17, 19 (emphasis added).

However, there are abundant inferences that could be drawn supporting simple possession. To start, Smith had no cash, cut, or scales on him—all classic indicia of distribution. Nor was the heroin packaged in "bindles," which suggests that it might not have been for sale. Though the amount of heroin seized made it "unlikely" it was for personal use, a Government expert testified that it was "possible" and that some users have the money to purchase in bulk. J.A. 615. Though Smith showed some awareness of the drug weight and the state trafficking threshold, a user would almost certainly know what quantity of drugs they had just purchased and would also have a vested interest in avoiding the trafficking cut-off. Even if the jury rejected these inferences, it could also have found that Smith simply *overheard* the police discussing the drug weight and thresholds with the

---

[6] To the extent the majority is faulting Smith for failing to present *affirmative* evidence of drug use, that flies in the face of its own opinion, which recognizes that simple possession "fairly may be inferred from the evidence presented" and disclaims any requirement to present affirmative evidence. *See* Majority Op. at 17–19.

magistrate. Though these inferences alone create enough of a dispute to require a lesser-included instruction for simple possession, the majority ignores them.[7]

The majority then doubles down on its head-in-the-sand approach by mischaracterizing or overstating the value of evidence supporting an inference of intent to distribute. For example, the majority notes that the Intratec firearm "was found in close proximity to the heroin, and Smith's DNA linked him directly to it." Majority Op. at 16. The majority neglects to mention that there was only "moderate support" for a DNA link to Smith, that this link was established using a "low-level DNA sample," and that no "major [DNA] contributor" was identified. J.A. 761, 763. And even if Smith had been caught *holding* the gun, "the presence of a gun in the proximity of drugs may support a finding of intent to distribute, [but] it does not compel such a finding." *United States v. Gentry*, 555 F.3d 659, 669 (8th Cir. 2009) (citation omitted). The district court recognized as much itself. *See* J.A. 837 (acknowledging that the jury can "certainly" disregard the presence of a firearm).

---

[7] The majority repeatedly rebukes me for "conduct[ing] what walks and talks like de novo review." Majority Op. at 22. But identifying "possible constructions of the evidence that are rationally possible," *Nur*, 799 F.3d at 159—even if the district court failed to draw them—is not de novo review. Rather, it is critical to determining if the district court abused its discretion. *See James v. Jacobson*, 6 F.3d 233, 239 (4th Cir. 1993) (holding an abuse of discretion is "an exercise that is flawed by erroneous factual or legal premises"). What's more, the majority also fails to explain why we must accord the district court's findings any deference when it applied the wrong legal standard. That, in and of itself, is an abuse of discretion. *Id.*

The majority also overstates the value of the text messages. Though the majority refers to the messages sent from the white LG cell phone[8] as "Smith's text messages," Majority Op. at 16–17, that is a disputed inference the jury was not required to make. Special Agent Razik himself acknowledged that drug dealers "may use telephones that are not subscribed in their name" and that he could not be sure who sent the messages. J.A. 618, 636. Thus, the majority's *certainty* that these were Smith's messages is unsupported by the record. And even if any juror would rationally conclude these were Smith's messages, they would not be compelled to infer that these messages evidenced Smith's intent to sell the *particular* heroin seized in the Malibu. Just because someone is a drug dealer does not mean they cannot also be a user. *E.g.*, *Levy*, 703 F.2d at 792 (noting police found drug manufacturing equipment *and* user paraphernalia at the defendant's home).

And the majority erroneously contends that the lack of spoons and needles recovered in the Malibu means "Smith did not have *any* . . . means of ingesting the heroin." Majority Op. at 17 (emphasis added). That claim is unsupported by the record. In fact, it's just an appellate court straying from its lane and weighing the evidence. Razik acknowledged that heroin can be snorted or orally ingested, and that some users actually

_____

[8] Smith acknowledged this was his phone at the suppression hearing. However, he did not admit this at trial, so the jury was not privy to that confession. The Government argued at trial that the phone must have been Smith's because his name was listed on the phone's Google Photo account and it was found in the Malibu's center console, close to where Smith had been sitting. At times, Smith's counsel appeared to concede that this was Smith's phone; at other times, he suggested this issue was still up in the air. Because the issue was disputed, the jury was not required to infer that it was Smith's phone. But as explained above, even if it *was* Smith's phone, that does not mean that he sent the text messages the majority unequivocally ascribes to him.

prefer this route due to stigma associated with needles or concerns about blood-borne diseases. It is also unclear why the majority assumes that even those heroin users who use spoons or needles must have those items on them at all times, especially while traveling in someone else's car.

Ironically, though it is the *majority* that neglects to draw all rational inferences in favor of simple possession and the *majority* that ignores numerous factual nuances in the record, it is the majority that chides *me* for failing to engage in a "holistic inquiry." *Id.* at 23. In effect, the majority is "pick[ing] the flower[s]" it likes and "ignor[ing the rest of] the garden" while accusing me of doing the same. *Id.* But the majority has no response to my observations regarding the many flowers it missed, or the fact that some of the flowers it picked were not actually flowers. The majority's true gripe seems to be that I do not weigh the beauty of some flowers against the rest of the garden, which of course is not the role of an appellate judge.

That brings us to its fourth "Do as I say, not as I do" endeavor: as alluded to above, the majority says the jury must resolve "factual dispute[s] in the evidence," *id.* at 21 (internal quotation marks omitted), yet it turns around and weighs the evidence in Smith's case itself. For example, it acknowledges it is "possible" someone would possess 3.32 grams of heroin for personal use, but finds this inference outweighed by the rest of Special

Agent Razik's testimony.[9] *Id.* at 15. Similarly, the majority claims—without any basis in the record—that a "firearm is much *more likely* to be present in a distributional scheme *than* in an instance of mere possession." *Id.* at 16 (emphases added) (citing *United States v. Fisher*, 912 F.2d 728, 730–31 (4th Cir. 1990) (merely noting that a "large amount of cash . . . [and] ownership of handguns is additional circumstantial evidence of . . . involvement in narcotics distribution" but conducting no comparison with the incidence of firearm ownership for cases involving simple possession)). Likewise, though the majority grudgingly admits that a jury could draw some inferences that cut against distribution, it still finds "distribution more likely." *Id.* at 23. Ultimately, it holds the district court did not abuse its discretion by finding that "the evidence of mere possession here was *weak*, and that of intent to distribute was *powerful*." *Id.* at 14 (emphases added). But weighing the evidence like this usurps the jury's role as fact finder. *See supra*, Part I.B.

Finally, in a riff on the majority's second "Do as I say, not as I do" error, the majority never adequately acknowledges factually analogous—and controlling—case law. Specifically, the majority cites *United States v. Levy* for a few miscellaneous propositions, yet it fails to note that this case is on all fours with *Levy*. If anything, it involves a much less extreme fact pattern. In *Levy*, police observed the defendant hold a meeting with a

---

[9] The majority also agrees with the district court that "it is 'close to inconceivable that a heroin addict . . . would take that entire quantity with him to go out to a nightclub.'" Majority Op. at 15 (quoting J.A. 835). It's not clear why the district court or the majority assume that Smith brought heroin to the nightclub. He might have bought it there. Or he might have left it in the Malibu while he visited the nightclub, as he did when he entered the gas station.

48

convicted drug trafficker in the defendant's car. *Levy*, 703 F.2d at 792. After the trafficker got in the car, Levy exited the vehicle, removed a laundry hamper from the back seat, and locked it in the trunk. *Id.* Police swooped in and arrested both individuals but found no drugs on the trafficker. *Id.* However, they did find $1,150 in cash on Levy in addition to 0.8 grams of 100% pure cocaine. *Id.* A search of the laundry hamper recovered two bags of cocaine "in a form too pure to be suitable for customary street distribution." *Id.* The cocaine in the bags weighed 4.75 ounces—equivalent to *1,300 doses*—worth between $14,000 and $35,000 depending on how much it was "cut." *Id.* Police also searched Levy's house and found "paraphernalia suited to chemical conversion" and four cocaine pipes. *Id.* At the time of his arrest, Levy was "unemployed and presumably without access to legitimate sources for the necessary funds" to purchase drugs. *Id.*

This Court in *Levy* acknowledged that though the case involved "substantial" amounts of drugs, they "do not necessarily so exceed the quantity one might stockpile for personal use over a relatively long period of time as to *eliminate all reasonable possibility* that the jury might draw such an inference." *Id.* (emphasis added). Thus, while these quantities were certainly "*sufficient* to permit an inference by the jury of an intent to distribute," the jury "was free to determine whether or not to draw [that] inference." *Id.* at 793 n.4 (emphasis added) (citation omitted). While the Court recognized that a jury might also infer that Levy's unemployment meant he was probably involved in drug trafficking, it found the jury could just as well infer that Levy resorted to "property crimes in order to finance [his] 'trips.'" *Id.* at 792.

49

Contrast that with the facts here: Smith was not arrested during a drug deal, had no cash on him, and had at most *thirty-three doses* of heroin in his possession—an amount that, according to record testimony, could be burned through in less than three days. This is a world apart from the massive quantity in *Levy*, which involved at least *forty times* the number of doses as in this case, but which we nevertheless held did not foreclose an inference of possession. In addition, unlike Levy, Smith's employment status is unknown, and police found no "cut" or instruments of "chemical conversion" with him. Neither the facts nor the law explains why the majority would believe that Levy was entitled to a lesser-included instruction but not Smith.

Nonetheless, the majority here—like the majority in *Wright*—zeros in on the fact that police found four cocaine pipes at Levy's house. *See* Majority Op. at 17, 24; *Wright*, 131 F.3d at 1115–16 (distinguishing *Levy* as a case purportedly relying on "considerable affirmative evidence [of drug use] unrelated to drug quantity"—the four cocaine pipes). It suggests that the possession instruction was required precisely because these paraphernalia were recovered. *See* Majority Op. at 17, 24. But the defendant in *Levy* did not have any user paraphernalia on him when he was arrested in his *own vehicle*; police only found cocaine pipes after searching his *home*. *See Levy*, 703 F.2d at 792. This means Smith—who had no paraphernalia on him while riding in someone else's car—is on at least as good a footing as Levy. In addition, the pipes in *Levy* were found alongside "paraphernalia suited

50

to chemical conversion"[10]—presumably equipment to process or cut cocaine. *Id.* That meant the evidence recovered from Levy's house was somewhat of a wash—evidence supporting an inference of possession was balanced by other evidence pointing to distribution. This case presents a similar situation in that no drug manufacturing implements were found, but neither were any drug paraphernalia recovered. The *Levy* Court let the jury weigh the evidence instead of sorting out the dispute itself. We should too.

The majority counters that this analysis "places almost singular controlling weight" on *Levy*. Majority Op. at 23. But the same could be said of the majority's near-total reliance on *Wright*. *See id.* at 17–19. Between the two, *Levy* makes more sense as a touchstone for a few reasons. To start, it is hard to say how much the *Wright* Court's affirmative-evidence detour impacted its reasoning. But since the *Wright* majority ignored inferences in favor of possession and "principally" distinguished *Baker* and *Levy* as "affirmative evidence" cases, *Wright*, 131 F.3d at 1115–16, it seems likely that its judgment rested—at least in part—on this rationale. And though the majority here rejects that reading of *Wright*, it never bothers to ask whether removing that particular Jenga block would cause *Wright*'s entire tower to come tumbling down. In addition, though the majority goes to great lengths to reframe *Wright* as a case involving a "significant evidence of intent to distribute . . . and *no*

_____

[10] The *Wright* majority seemed to mistakenly believe that "paraphernalia suited to chemical conversion" supported an inference of "mere possession." *See Wright*, 131 F.3d at 1115. It is hard to know what the majority here makes of this evidence since it does not address it at all.

countervailing evidence supporting an inference of personal use," Majority Op. at 19 (emphasis added), *Wright* itself forthrightly acknowledged it was weighing an inference of possession based on drug weight "*against* the backdrop of the powerful evidence of distribution," *Wright*, 131 F.3d at 1113 (emphasis added). This, of course, means the *Wright* decision rests on an inappropriate "weighing [of] the probabilities." *Levy*, 703 F.2d at 792. In sum, because *Wright* is on doubly shaky ground, our earlier decision in *Levy* should control. And under *Levy*, Smith is entitled to a lesser-included instruction.

This conclusion becomes even more apparent if we look outside this Circuit. For example, in *Lucien*, the Fifth Circuit found a simple possession instruction required when the defendant was caught with 16.48 grams of cocaine (about 160 doses), which he "was flushing . . . down the toilet when the police arrived"; $1,200 in cash; two guns; and foil wrappers consistent with cocaine distribution. *Lucien*, 61 F.3d at 375. Similarly, in *United States v. Gentry*, the Eighth Circuit required a possession instruction when a search of the defendant's vehicle turned up 92.07 grams of a cloudy liquid containing methamphetamine;[11] "various chemicals and equipment associated with the production of meth[]", including "starter fluid, a funnel, coffee filters, rubber tubing, and ephedrine"; and several firearms. 555 F.3d at 661–62, 666–69. Likewise, in *United States v. Nur*, the First Circuit required a possession instruction when the defendant fled and was caught with three

---

[11] Gentry was only charged with an intent to distribute the liquid meth mixture found in her car. *Gentry*, 555 F.3d at 666. But police also recovered 24.3 grams of powder methamphetamine in a plastic bag from the ground where her car was parked. *Id.* at 661, 666. This bag was further subdivided into seven Ziploc bags, which supported a finding of intent to distribute the liquid meth. *Id.* at 667.

individually wrapped bags containing 7.27 grams of crack cocaine worth about $700; officers discovered $1,700 in Nur's hotel room—which he later admitted was his money—separated in hundred-dollar increments and wrapped in elastic; and Nur allegedly confessed that he had been on the way to sell the crack found in his possession. 799 F.3d at 156–57, 156 n.1, 160–61.

The consistent element in these out-of-circuit cases is appropriate deference to the jury's fact-finding role. For example, in *Lucien*, the Fifth Circuit correctly noted that "it is *the jury's* role to decide whether the evidence supports simple possession or possession with intent to distribute." *Lucien*, 61 F.3d at 376 (emphasis in original). Because the majority gives its deference to the district court, and not the jury, I must dissent.

## II.

Though the majority says that it seeks to offer clarity and consistency to district courts, it miserably fails to do so. Instead, district court judges will be hard pressed to find any clarity or consistency in the majority opinion, which leaves more questions than it answered. Among them: May we leave "the appellate lane" to do the district court's work for it when it legally errs? What, precisely, is a "sufficient" dispute in the evidence? Has the "however weak" language in *Baker* been overruled by implication? May district courts weigh evidence of distribution against that of possession after all? Are district courts required to draw inferences in favor of possession as well as distribution? Is *Levy* defunct? Is *Wright* still good law with one of its primary pillars removed? Is affirmative evidence of drug use not required in name, but still required in fact?

53

Thankfully, the majority's improper conflation of the evidence-weighing roles of the trial judge and the jury is foreclosed by *Baker* and *Levy*, which, as the earlier decisions, must control. These earlier cases direct us to vacate and remand this matter for a new trial in which the jury would receive the lesser-included instruction. Accordingly, I join Parts II and IV of the majority's opinion; dissent from Parts III and V; and dissent from the judgment.